[No. 38712.    Department One.    July 27, 1967.]

GRIFFITHS & SPRAGUE STEVEDORING COMPANY, *Respondent,* v. BAYLY, MARTIN & FAY, INC., *Appellant.*\*

*Reported in 430 P.2d 600.

*Little, Gandy, Stephan, Palmer & Slemmons, Robert L. Palmer,* and *Serge S. Gorny,* for appellant.

*MacBride & Sax* and *Kenneth G. Burrows,* for respondent.

HALE, J.—Bayly, Martin & Fay, Inc., is a California corporation operating as an insurance broker in California; Griffiths & Sprague Stevedoring Company, a Washington corporation, using the firm name of Farwest General Agency, is also an insurance broker, but principally in Washington. Insurance brokers procure insurance for their customers.

In 1962, Bayly, Martin & Fay requested Farwest to obtain insurance for Cisco Aircraft, Inc., a customer negotiating for a crop-dusting and forest insecticide spraying contract. Farwest, through its London broker, Heath & Company, obtained the insurance from underwriters at Lloyds of Lon-

don in a combination of policies, which, because of the nature of the risk, had a rapidly increasing premium. By the time the policies had earned a premium of $41,275.15, Cisco Aircraft, the insured, had become insolvent. Farwest paid the premium to their correspondent broker, Heath & Company, in London, and now seeks recovery of the amount from Bayly, Martin & Fay.

From a $41,275.15 judgment entered on a verdict, and a special verdict answering "yes" to the interrogatory, "Did the defendants agree that premiums due on the policies delivered to them for the use of Cisco Aircraft Co. were to be charged to them?" Bayly, Martin & Fay, Inc., appeals. Nine assignments of error raise three specific points. Additional operative facts will be set forth as they appear essential to elucidate the points involved.

Defendant assigns error to the court's refusal to dismiss Farwest's complaint for failure to comply with the assumed-name statute. RCW 19.80.040 reads:

> No person or persons carrying on, conducting or transacting business as aforesaid, or having an interest therein, shall hereafter be entitled to maintain any suit in any of the courts of this state without alleging and proving that such person or persons have filed a certificate as provided for in RCW 19.80.010, and failure to file such certificate shall be prima facie evidence of fraud in securing credit.

Plaintiff identified itself in the amended complaint as Griffiths & Sprague Stevedoring Company, doing business as Farwest General Agency, and as a Washington corporation with its principal office in Seattle, alleging also that it had "duly filed the certificate required by law (R.C.W. 19.80.010.)." The amended complaint, verified December 4, 1963, was filed with the clerk of court December 26, 1963.

As it turned out, plaintiff had not filed an assumed-name certificate and failed to do so until both parties had rested at trial. At the close of the evidence, plaintiff did file the certificate, and the court granted it leave to reopen for the purpose of proving it had done so. Defendant argues that want of compliance with the assumed-name statute is vital

to its defense because the statute of limitations started to run during trial and allowing the plaintiff to reopen for the purpose of proving the filing of a certificate under RCW 19.80.010 deprived it of a categorical defense. But the record shows this defense to be unavailable to defendant.

■ Although, as we have noted, under RCW 19.80.040 no persons carrying on any business within the state may maintain any suit or action in any court without pleading and proving the filing of an assumed-name certificate prescribed in RCW 19.80.010, the legislature apparently intended to exempt corporations from this requirement if the corporation identifies itself in its pleadings both as to its true corporate name and its assumed name.

A reading of RCW 19.80.020, we think, compels this interpretation:

> This chapter shall in no way affect or apply to any corporation duly organized under the laws of this state, or to any corporation organized under the laws of another state and lawfully doing business in this state; nor shall this chapter be deemed or construed to prevent the lawful use of a partnership designation, name or style: *Provided*, That such partnership designation, name or style shall include the true and real name or names of all of the parties conducting such business or having an interest therein; nor shall this chapter affect or apply to any limited partnership now legally organized or to be organized within this state.

Our opinion in *Seattle Ass'n of Credit Men v. Green*, 45 Wn.2d 139, 142, 273 P.2d 513 (1954), acknowledges that, where suits are brought in the true corporate name, the filing of an assumed name pursuant to the statute is unnecessary:

> The language of the statute (Rem. Rev. Stat., § 9979), stating that the chapter shall in no way affect or apply to any corporation, is necessary. Its result is that *a corporation is not obliged to comply with the act to avoid its consequences in suits brought under its corporate name.* (Italics ours.)

We would accordingly rule that, where the pleadings identify the corporate party by both its corporate name and

the assumed name or names under which it transacts business, it is exempt from the filing of an assumed-name certificate under RCW 19.80.010.

Since plaintiff corporation identified itself in its complaint by pleading both its true corporate name and its assumed name, it came within the exemption (RCW 19.80.020), and was not obliged to file an assumed-name certificate as a condition precedent to maintaining its action in the courts. That it chose to file a certificate before concluding its case did not affect its obligation under the statute, nor create a duty where none existed before.

The next point concerns whether the court obtained jurisdiction of defendant corporation under the long-arm statute. RCW 4.28.185(1) states:

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:
>
> (a) The transaction of any business within this state; . . . .

Defendant says that the mere request by telephone and mail from a party out of state transmitted to a party here for relay to another state, or even more remotely to a foreign country, is not the transaction of business within this state, and that the substantive requirement of transacting any business within this state did not occur and, therefore, plaintiff picked the wrong forum for his action, citing *Hanson v. Denckla,* 357 U.S. 235, 2 L. Ed. 2d 1283, 78 Sup. Ct. 1228 (1958); *Tyee Constr. Co. v. Dulien Steel Prods., Inc.,* 62 Wn.2d 106, 381 P.2d 245 (1963); and *International Shoe Co. v. Washington,* 326 U.S. 310, 90 L. Ed. 95, 66 Sup. Ct. 154, 161 A.L.R. 1057 (1945).

Defendant, with good logic, points out the injustice generated by a strained construction of the long-arm statute which compels a nonresident to incur the risks, expenses and uncertainty of defending himself in far distant courts

when the judicial system of California, his state of residence, stands ready at all times to provide him forum for redress. Defendant adds that the record shows no affirmative steps taken by it to submit to Washington jurisdiction and that the telephone conversation and letters did not place the transaction here, but that it occurred either in California or London. Nothing took place in Washington, says defendant, from which it can be said to have submitted to the jurisdiction of Washington courts.

■ In the absence of a connecting tie or link between a nonresident and the forum state, the long-arm statute does not vest jurisdiction in the courts of a forum state where none existed before enactment of the statute. But the statute does tacitly recognize as an economic fact of modern life that large segments of commerce, finance, manufacturing and agriculture inevitably seek out a connection with or link to customers, consumers, users, fabricators, processors, or subcontractors in other states who intend or contemplate that the product, process or article of commerce, manufacturing or agriculture shall be consumed, used or employed in states other than the place of origin or beginning.

The connecting link then may consist of affirmative acts taking place here by which the out-of-state resident overtly submits to jurisdiction (*Quigley v. Spano Crane Sales & Serv., Inc.,* 70 Wn.2d 198, 422 P.2d 512 (1967)); or the initiation of a transaction outside the state in contemplation that some phase of it will take place in the forum state (*Nixon v. Cohn,* 62 Wn.2d 987, 385 P.2d 305 (1963)); or the start of a commercial process outside the forum state on the assumption that the article will be sold, used or acted upon or within many other states but with no particular jurisdiction in actual contemplation. *Golden Gate Hop Ranch, Inc., v. Velsicol Chem. Corp.,* 66 Wn.2d 469, 403 P.2d 351 (1965). The existence of these phenomena of modern economy are ordinarily enough to bring the parties within the long-arm statute without engendering an unjust or oppressive extension of jurisdiction.

Where, of course, it appears that the long-arm statute is employed as an instrument of oppression involving an abuse of judicial process or employment of the courts in a plan or scheme for unlawful harassment and injury, and other than in a bona fide use of the courts to obtain a lawful judgment or decree—that is, where the means overshadow the ends in the scheme of litigation—then the long-arm statute would not establish jurisdiction if none existed before its enactment. We said this in *Tyee Constr. Co. v. Dulien Steel Prods., Inc., supra,* in stating that assumption of jurisdiction "must not offend traditional notions of fair play and substantial justice."

■ When defendant, Bayly, Martin & Fay, insurance brokers in Los Angeles, ordered insurance by telephone and mail from or through plaintiff, Farwest General Agency, insurance brokers in Seattle, Washington, it overtly performed acts making it a party to and participant in a business transaction in Washington even though it was contemplated by Bayly, Martin & Fay that the insurer might be a foreign agency. Defendant thus submitted to the jurisdiction of Washington courts under the long-arm statute as to that particular transaction.

The third point is whether the record shows sufficient evidence to prove either an express or implied agreement by Bayly, Martin & Fay to pay the Cisco Aircraft premium. Plaintiff argues that the evidence proved an express contract; defendant says the arrangement proved no such agreement whatever, either express or implied.

Since both defendant and plaintiff were brokers under the insurance code (RCW 48.17.020), defendant contends that it could not and did not incur personal liability when representing a disclosed principal in procuring insurance coverage.

RCW 48.17.020 says that:

"Broker" means any person who, on behalf of the insured, for compensation as an independent contractor, for commission, or fee, and not being an agent of the insurer, solicits, negotiates, or procures insurance or reinsurance or the renewal or continuance thereof, or in any manner

aids therein, for insureds or prospective insureds other than himself.

Defendant adds that, in paying the premium on the Cisco policies to Heath & Company in London, plaintiff acted as a volunteer without binding defendant to make reimbursement.

■ We do not depart from the familiar rule that, when an agent makes a contract on behalf of a disclosed or partially disclosed principal whom he has power to bind, he does not thereby become liable for his principal's nonperformance. Restatement (Second), Agency § 328 (1958); 3 Am. Jur. 2d *Agency* § 294 (1962). But, regardless of the parties' position under the insurance code (RCW 48.17.020), it is the relationship between them in the instant transaction which governs here. If the facts surrounding the transaction allowed the jury to infer an agreement to pay the premiums, then, under familiar and well-established rules, a reviewing court ought not disturb the verdict (*Kasey v. Suburban Gas Heat of Kennewick, Inc.*, 60 Wn.2d 468, 374 P.2d 549 (1962)), unless, of course, such agreement was otherwise impermissible.

Our study of the evidence shows that the jury had ample evidence, although conflicting on many disputed points, from which to find an express agreement by Bayly, Martin & Fay to pay the premium. Early in March, 1962, Mr. Baxter Pond, manager of defendant's aviation department, telephoned his counterpart at Farwest, Mr. Harold Hansen, manager of plaintiff's aviation department, to inquire if plaintiff brokers could supply insurance for Cisco Aircraft.

The two departmental managers were experienced in handling the highly complex and fast moving aviation insurance business and had, on earlier occasions, transacted business with each other for their respective companies. Both knew that the Cisco Aircraft policies were of a high, rapidly rising premium type, for the policies were to provide liability coverage on a large crop-dusting and airborne insecticide spraying contract Cisco was about to perform, and that the premiums would increase rapidly as the number of planes and the flight hours increased.

In the course of telephone conversations and correspondence concerning placement of the Cisco Aircraft coverage, culminating in a confirmatory telegram of March 27, 1962, that the contracts of insurance had been consummated, it developed that Mr. Hansen of Farwest had no knowledge whatever of Cisco Aircraft except what he learned from Mr. Pond. Hansen, testifying on behalf of plaintiff Farwest, said:

Well, these aviation coverages, some of them, earn premiums very fast, and they develop a lot of premiums. This particular operation involved a fleet of aircraft that got up to be around thirty to forty airplanes, including old B-17's and a whole flock of airplanes, and the values were pretty high, so we always insist to these outside agents, brokers, that we deal with, we alert them to the fact that this will develop a lot of premium, and if it was a company that I didn't know about, I would have asked for money in hand before I did anythhing, but we knew who Bayly, Martin & Fay were. But I did caution Pond that these policies would earn a lot of premium, and he said yes, he knew that, and in fact, one time I remember a memo, he said hurry up, get on the ball so I can get my premiums, but I did caution him that the policies would earn premiums in a hurry, and he told me that there were a lot of details such as certificates we had to file with the Forest Service. This man, Cisco, had a contract to spray thousands of acres of forest land in Montana. The government wanted verification of his liability insurance and many things of that nature.

and

I didn't know Cisco from adams off ox. All I had was a letterhead that said he had a chemical business. He was a man of many businesses, and all I knew was what Mr. Pond sent to me.

Other evidence tending to show that Farwest arranged the insurance for the account of and on the credit of Bayly, Martin & Fay, may be seen in the telegram of March 27, 1962, alluded to above. Addressed and delivered to Baxter Pond of Bayly, Martin & Fay, it said: "This certifies we holding bound effective April 2, 1962 for your account following coverages."

Later, correspondence between the two brokers concerning the nonpayment of the increasing premium left a fair inference for the jury to find that the insurance had been sold to and on the credit of Bayly, Martin & Fay. The testimony of Baxter Pond, aviation manager for Bayly, Martin & Fay, presented by deposition, bears this out. When asked what the words "for your account" in the telegram meant, he answered:

Well, I image just exactly what it says there, for the account of Bayly, Martin & Fay. . . . Now I believe at one time that I asked Harold [Hansen] if he wanted to place this business direct with Cisco, and whereby he told me that he didn't want to do this.

He testified that all invoices showing coverage and premiums due were directed by Farwest to Bayly, Martin & Fay and that Farwest had no contract whatever with the assured, Cisco Aircraft.

Finally, in determining whether the jury heard sufficient evidence from which to find an agreement by Bayly, Martin & Fay to pay the premium and look to its customer, Cisco Aircraft, for ultimate repayment, we refer to other parts of Mr. Pond's testimony:

Q. Is there any word of art or any particular meaning to the words in this telegram, Exhibit One, "we holding bound for your account"? A. I can see nothing. It is a standard phrase that is used every day. Q. What does it mean? A. That the business has been placed specifically, the items, what we have previously discussed, the coverage is in effect, that it is bound, that—like a wholesaler to a retailer, here it is, and we will invoice you shortly for the account. . . . Q. Did it have any meaning in regard to who was going to pay the premium? A. Well, I would say that the premium would be paid by Bayly, Martin & Fay, for their account. . . . Q. In your conversations with Mr. Hansen, did you ever discuss the matter of who was liable for the premium? A. I don't recall specifically, but I would say that there was no question that Harold would be looking to Bayly, Martin & Fay to pay the premium.

■ It has become nearly axiomatic that, where a verdict has been reached on substantial, credible evidence, it

will not be disturbed on review. Despite marked conflicts in the proof, the jury had before it ample evidence from which to find that plaintiff procured the Cisco insurance coverage on an undertaking by Bayly, Martin & Fay to pay the premiums therefor.

Affirmed.

FINLEY, C. J., HILL and ROSELLINI, JJ., and DENNEY, J. Pro Tem., concur.

*Reported in 430 P.2d 956.