535 P.2d 664

**GENERAL MOTORS ACCEPTANCE CORPORATION, a corporation, Plaintiff and Appellant,**

v.

**TURNER INSURANCE AGENCY, INC., and Westchester Fire Insurance Co., a corporation, Defendants and Respondents,**

and

**Gerald B. Wahlen, Defendant.**

**No. 11538.**

Supreme Court of Idaho.

April 11, 1975.

Rehearing Denied June 10, 1975.

Jack G. Voshell, of Voshell & Wright, Idaho Falls, for plaintiff and appellant.

James B. Green, of Terrell, Green, Service & Gasser, Pocatello, for defendants and respondents.

McQUADE, Chief Justice.

This is an appeal in an action to recover a $2,156.00 refund on an unearned physical damage insurance premium. Plaintiff-appellant, General Motors Acceptance Corporation (hereinafter GMAC) brought this action to recover this sum which it claimed was misappropriated by the joint action of the defendants-respondents, Turner Insurance Agency, Inc., (hereinafter Turner Insurance) and Westchester Fire Insurance Company (hereinafter Westchester Fire) and defendant, Gerald B. Wahlen. Judgment for the sum claimed was granted to the appellant by the trial court against the defendant, Gerald B. Wahlen, but upon its claim against Turner Insurance and Westchester Fire, relief was denied. Plaintiff-appellant appeals from that part of the judgment that denies recovery upon its claim against defendant-respondents, Turner Insurance and Westchester Fire. We reverse.

On April 30, 1968, defendant Wahlen entered into a conditional sales contract with Monie Oldsmobile in Phoenix, Arizona, to purchase a 1963 Mack Diesel truck and a 1956 Hyde Flatbed trailer. A few days later Wahlen consummated a second conditional sales contract whereby he purchased a 1963 White truck and a 1964 Biltwell trailer from the same dealer. Financing for both purchases was arranged through Monie Oldsmobile. Included in the combined total price on the two conditional sales contracts was a $4,470.00 charge. This charge was to protect the vendor's security interest in the vehicles through the purchase of physical damage insurance for the three year life of the two sales contracts. Both contracts were assigned by Monie Oldsmobile to GMAC. GMAC purchased the physical damage insurance from Motors Insurance Corporation (hereinafter MIC) paying out $4,470.00 for a three year term at the time the vehicles were delivered.

In June of the same year, Wahlen moved from Arizona to Aberdeen, Idaho. Recognizing that changes in his insurance coverage were necessary in order to obtain Public Utility Commission filing to legally operate his vehicles, Wahlen contacted Turner Insurance, an agent for Westchester Fire. On June 19, 1968, Turner Insur-

ance wrote to MIC requesting a cancellation of the insurance policies it had issued on the vehicles. MIC complied with this request and refunded the unearned premium to GMAC. On July 16, 1968, GMAC sent a letter to Wahlen (with a copy to Turner Insurance) indicating that an unearned premium had been received from MIC. In that letter, GMAC indicated that it was ready to deal with Turner Insurance regarding the purchase of physical damage insurance for the three year term of the sales contracts.

GMAC advised Wahlen in an August 12 correspondence that it had received a note from Turner Insurance implying that the latter expected GMAC to forward the first year's premium of $1,653.00 to cover both "physical damage" and "liability coverage" on the vehicles. The letter went on to state that since liability coverage was not included in the original contracts, the refunded premium was "available for purchase of *physical damage* (collision and comprehensive) *coverage only.*" [Emphasis in original]. The letter advised Wahlen that the refunded premium could be used in one of several ways:

(1) To purchase physical damage insurance for the remaining term of the contract.
(2) To purchase physical damage coverage for one year on each contract.

In both cases any residual would be applied to his accounts to reduce the monthly payments.

(3) Applied to the contract balance still outstanding to reduce the monthly payments.

Under this third alternative, Wahlen was to make his own arrangement for purchasing insurance. A copy of this letter was sent to Turner Insurance.

On August 14, Wahlen replied to GMAC, requesting that the first year premium of $1,653.00 be mailed to Turner Insurance with the balance of the unearned MIC premium mailed to him at his Aberdeen address. This letter was dictated by the president of Turner Insurance at Wahlen's request and signed by Wahlen.

In a letter dated August 21st written to Wahlen, (without a copy to Turner Insurance) GMAC informed Wahlen that the sales contracts were delinquent and rejected Wahlen's request that the balance of the unearned premium be returned to him. It informed him that any excess could only be used as a credit to the final installments due on the accounts. On the same day, GMAC wrote to Turner Insurance (with a copy to Wahlen) advising it that upon receipt of a certificate of insurance, it would forward the premium.

Turner Insurance sent GMAC the certificate of insurance on August 27th, showing that coverage for a three-year period, to be billed annually at $1,078.00 per year, had been issued by Westchester Fire. In response, in a letter dated September 3rd, GMAC queried if the entire three-year premium could be prepaid. Turner Insurance by letter of September 17th replied to this inquiry in the affirmative, quoting a total cost of $3,234.00 for a three-year period.

On or about September 26, Turner Insurance received the requested amount from GMAC. From the funds received, Turner Insurance used $1,078.00 to pay the first year's premium. It utilized an additional $828.00 to cover debts allegedly owed to it by Wahlen, and the balance ($1,328.00) was returned to Wahlen at the latter's instruction and request.

Subsequently Wahlen defaulted on the contracts. GMAC repossessed the vehicles and sold them at private sales. Westchester Fire cancelled the insurance coverage on the vehicles as of June 15, 1969. GMAC demanded return of the two year's unearned premium but was refused. Turner Insurance claimed that the Wahlen account was settled when it had returned to him the balance of the funds, $1,328.00 in October of 1968. The trial court rejected appellant's claim that Turner Insurance and Westchester Fire were obligated to return to it the unearned premium remaining

on the policy. The appellant appeals to this Court from that decision.

Appellant makes many assignments of errors, founded in contract, tort, agency and trust law. GMAC contends that an express or implied agreement was made between itself and the respondents to provide insurance coverage for a three-year period on vehicles in which GMAC held an insurable interest. That agreement, as evidenced by the policy issued by Westchester Fire's agent, Turner Insurance, and paid for in full, covered the vehicles for three years. Appellant argues that the respondents breached their contractual obligation by not returning the unearned premiums after the policy was cancelled. We agree.

GMAC began preliminary negotiations with Turner Insurance for insurance coverage in July of 1968. It requested an estimate for physical damage coverage on the vehicles. GMAC received in response to its inquiry a figure which reflected liability insurance in addition to physical damage. It rejected this figure since liability coverage was not included in the original transaction between the assignor Monie Oldsmobile and Wahlen. Turner Insurance finally agreed to draft a policy which included only physical damage coverage.

■ GMAC by letter then offered to pay a three-year premium in advance.

"Inasmuch as we have a total of $4,183.-43 in suspense for physical damage insurance on Mr. Wahlen's vehicles, would it be possible for me to pay a three-year premium at this time rather than only the one-year as we would like to get Mr. Wahlen's accounts set up so that no additional billing will be necessary each year. If this is possible, please advise the amount necessary for the three-year period and our check will be forwarded at once."

The above quoted paragraph from a September 3 letter sent by GMAC to Turner Insurance, reflects an offer to enter into a three-year contractual arrangement. Corbin on Contracts states:

"* * * an offer creates a power of acceptance in the offeree. It will not be disputed by any one that, after an offer is made, a voluntary expression of assent by the offeree is all that is necessary to create what we call contract." [1]

In a September 17 letter, Turner Insurance accepted this offer on behalf of its principal Westchester Fire.

"You may pay this premium three year prepaid which should be $3,234.00. * * * We would appreciate your check."

This offer and acceptance created an express bilateral executory contract between GMAC and Westchester Fire. Corbin on Contracts further states:

"A bilateral contract consists of mutual promises, made in exchange for each other by each of the two contracting parties. * * * In a bilateral contract both parties are promisors and both parties are promisees; and the legal effect of such a contract is that there are mutual rights and mutual duties." [2]

■ It is well established that parties can make an enforceable contract by means of letters exchanged in the due course of the mail.[3] A contract will be enforced where the terms of the agreement are clear and definite and the bargain is supported by consideration. In the transaction between GMAC and Westchester Fire acting through its duly authorized agent, Turner Insurance, the promises and performances to be rendered were certain. Westchester Fire was to supply three years of insurance in exchange for GMAC's remittance of $3,234.00. Where "[t]he terms of the contract are unambiguous * * * the parties must be held to have intended what is clearly expressed by the language used." [4]

1. 1 Corbin on Contracts 24, § 11 (rev. ed. 1963).

2. Id. at 52, § 21.

3. See Leaf v. Codd, 41 Idaho 547, 240 P. 593 (1925).

4. Farm Credit Corp. v. Meirotto, 50 Idaho 538, 541, 298 P. 378, 379 (1931).

The contract was supported by adequate consideration.

"A promise is a sufficient consideration for a return promise. This has been true for at least four centuries, ever since bilateral contracts were recognized."[5]

▮▮ The final issue before this Court is to determine who must recompense GMAC for the $2,156.00 refund on the unearned insurance premium. Mr. Turner (president of Turner Insurance) testified at trial that he was acting as an agent of Westchester Fire during the course of his dealings with GMAC.

"Q. You are an agent for Westchester Insurance Company?"

A. Yes, sir.

Q. And this policy that was issued was on that company on these particular vehicles for three years?

A. Yes, sir."

Under agency law, the principal will become a party to a transaction conducted by an agent who acts within his actual, apparent or inherent agency power.

" * * * a principal is subject to liability upon a transaction conducted by his agent, whom he has authorized or apparently authorized to conduct it in the way in which it is conducted, as if he had personally entered into the transaction."[6]
There is no contention that Turner Insurance was not authorized to enter into an agreement for its principal to provide insurance to GMAC for three years. Therefore we conclude that as principal Westchester Fire was bound by the contractual arrangement negotiated by its agent.

▮ When Westchester Fire cancelled the insurance coverage effective June 14, 1969, at the request of Turner Insurance with more than two years still remaining under the insurance contract, it was obligated to return the unearned premium to GMAC.

"As a general rule, an insurer * * * upon cancelling a policy must return advance premiums which have been paid and are unearned."[7]
Failure to do so constituted a breach of contract.

"The duty of the insurer to return unearned premiums is contractual or quasi-contractual in nature. Accordingly if the insurer improperly fails to return the unearned premium to the insured, the latter may sue the insurer for breach of contract."[8]

▮ In the two original conditional sales contracts between Wahlen and Monie Oldsmobile, Wahlen had authorized Monie Oldsmobile to secure the necessary insurance and add this charge to the total price on the contracts. When these contracts were assigned to GMAC, it procured the insurance, paid the premiums due, and the policy was issued upon the payment of the premiums. GMAC had a beneficial interest in the insurance policy issued, and in the proceeds thereof. It had an insurable interest in the vehicles it was financing, and was in fact a party insured.[9]

▮ Although Turner Insurance negotiated the insurance contract for its principal, and also signed the insurance certificate that was issued, it did not contract on its own account but rather as the authorized representative of Westchester Fire. We do not find Turner Insurance liable to GMAC for the return of the unearned insurance premiums.

▮ A person making a contract with another as an agent for a disclosed principal does not become a party to the

5. 1 Corbin, *supra* note 1, at 611, § 142.

6. Restatement of Agency Second § 140 (1958).

7. 6 Couch on Insurance 2d § 34:29 (1961).

8. *Id.* at 34.1.

9. *See* P. & E. Finance Co. v. Globe & Republic Insurance Co., 205 Okl. 627, 239 P. 2d 1009 (1952): San Jacinto Finance Corporation v. Eagle Star Insurance Company, 348 S.W.2d 286 (Tex.Ct.Civ.App.1961) ; Dorsey Mississippi Sales, Inc. v. Newell, 251 Miss. 77, 168 So.2d 645 (1964).

contract.[10] A principal is "disclosed" if, at the time of making the contract in question, the other party to it has notice that the agent is acting for a principal and of the principal's identity.[11] Prior to the time the contract to prepay three years of insurance was entered into, there was ample evidence which would indicate that GMAC was aware of Turner Insurance's role as agent and cognizant of the identity of Westchester Fire as principal.

█ We conclude, consistent with well established agency principles, that an agent by making a contract only on behalf of a disclosed principal, whom he was power to bind, does not thereby become liable for its non performance.

> "One who makes a contract only on account of another ordinarily does not himself contemplate responsibility for its performance. His function is performed if he causes a contract to be made between his principal and the third person. He guarantees neither the honesty nor the solvency of the principal."[12]

█ It is not clear from the record whether Turner Insurance's agency relationship with its principal, Westchester Fire contemplated the acts taken by Turner Insurance on October 2nd, 1968, when it received the prepaid insurance premiums from GMAC. It is well established in agency law that a principal has judicial recourse against an agent who subjects his principal to liability because of a wrongful act beyond the agent's authority.[13]

It is unnecessary for this Court to consider appellant's other assignments of errors, as we find its contention based upon contract doctrine to be dispositive.

Costs to appellant. Cause is reversed and remanded for proceedings consonant with this opinion.

DONALDSON and BAKES, JJ., concur.

SHEPARD, J., dissents without opinion.

McFADDEN, Justice (concurring in part and dissenting in part).

I must respectfully dissent from that portion of the majority opinion holding that Turner Insurance is not liable to GMAC for return of the unearned insurance premiums. In my opinion, liability of Turner Insurance to GMAC should be predicated on the conclusion that Turner converted the funds of GMAC or that a resulting trust was created when GMAC paid funds to Turner Insurance for the purpose of procuring insurance.

I

GMAC paid Turner Insurance the amount of $3,234.00 by two checks for the purchase of a three year physical damage insurance policy. GMAC submitted the checks in response to a letter from Gwen Sheppard, an agent of Turner Insurance, whereby Turner Insurance accepted GMAC's offer to enter into a three-year contractual agreement. On stubs attached to both checks was the notation "MIC return prem. to apply to o/s ins policy. WHALEN, GILBERT" and account number 11606. Upon receipt, Turner Insurance recorded the amount of "Three Thousand Two Thirty Four & NO/100" (3234.00), as received from General Motors Acceptance for "material damage portion of auto", on the account of Gerald Wahlen. The check stubs were attached to the Turner Insurance receipt. Turner used $1,078 to pay the first year's premium, $828 to cover debts allegedly owed to Turner Insurance by Wahlen, and $1,328 was returned to Wahlen.

10. Restatement of Agency Second, *supra* note 6, at § 320.

11. *Id.* § 4.

12. *Id.* § 328, Comment *a*. *See Also* Ferrarell v. Robinson, 11 Ariz.App. 473, 465 P.2d 610 (1970); Fink v. Montgomery Elevator Co. of Colo., 161 Colo. 342, 421 P.2d 735 (1966);

State ex rel. Carlton v. Triplett, 213 Kan. 381, 517 P.2d 136 (1973); Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc., 71 Wash.2d 679, 430 P.2d 600 (1967).

13. *Id.* § 401, Comment *d*.

This court has defined conversion as: "* * * any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein, such as a tortious taking of another's chattels, or any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of the possession, permanently or for an indefinite time." Warm Springs Properties, Inc. v. Andora Villa, Inc., 96 Idaho 270, 526 P.2d 1106, 1107–08 (1974), quoting Klam v. Koppel, 63 Idaho 171, 179, 118 P.2d 729, 732 (1941).

The money must be specifically described or identified as a specific chattel before an action for conversion by misappropriation of money will lie. Warm Springs Properties, Inc. v. Andora Villa, Inc., supra, at p. 1108 of 526 P.2d.

In the case at bar, GMAC submitted two checks to Turner with the purpose for which the money was to be used noted on a stub attached to each check. Turner Insurance noted this purpose on the receipt issued for the checks accepted. Thus, the funds, when received by GMAC, were specifically identified as to the amount and the purpose for which they were to be used. However, Turner Insurance did not use the funds for the agreed upon purpose; therefore, it is my opinion that Turner Insurance is liable to GMAC under the conversion theory outlined above.

## II

The doctrine of resulting trusts, developed in equity is often applied but seldom defined.

"[A] resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person thereby becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and although there is an absence of fraud or constructive fraud." 76 Am.Jur.2d, p. 429 (1975).

See, Restatement, Trusts 2d, § 404, 440 (1959). A resulting trust

"arises by implication of law from their acts and conduct apart from any contract, the law implying a trust where the acts of the party to be charged as trustee have been such as are in honesty and fair dealing consistent only with a purpose to hold the property in trust, notwithstanding such party may never have agreed to the trust and may have really intended to resist it." Shepard v. Dougan, 58 Idaho 543, 553–54, 76 P.2d 442, 445 (1937).

See, V Scott on Trusts, § 404.1, p. 3213 (1967); Motherwell v. Taylor, 2 Idaho 254, 10 P. 304 (1886).

Turner Insurance Company accepted money from GMAC for the purpose of purchasing property damage insurance for three years; with the acceptance of the money, a trust relationship to use the money for the designated purposes was created. Turner did not use the funds for that purpose. Therefore, the acts of Turner Insurance were contrary to the trust relationship implied between Turner Insurance and GMAC and Turner should be held to be liable to GMAC[1] for breaching that resulting trust relationship. The record indicates that there is clear, cogent, and convincing evidence to give rise to a resulting trust. Mollendorf v. Derry, 95 Idaho 1, 5, 501 P.2d 199 (1972).

---

1. Wahlen is not entitled to the funds because "[t]he trust results in favor only of the person advancing the consideration, and not in favor of one for whose benefit the purchase may have been intended". 76 Am.Jur.2d, Trusts, § 206, p. 437 (1975). Accord, Restatement, Trusts 2d, § 440 (1959).