[No. 27209-8-I.   Division One.   December 28, 1992.]

LAMAR D. HAVENS, *Respondent*, v. C&D PLASTICS, INC.,
ET AL, *Appellants*, JOSEPH W. MORAN,
*Respondent*.

*Bruce W. Hilyer, David N. Mark,* and *Culp, Guterson & Grader; Malcolm L. Edwards* and *Edwards, Sieh, Wiggins & Hathaway, P.S.,* for appellants.

*Frances E. Pennell; Frederick R. Boundy* and *Christenson, O'Connor, Johnson & Kindness,* for respondent Havens.

FORREST, J. — C&D Plastics, Inc. (C&D) appeals an award for breach of contract and promissory estoppel damages to Lamar D. Havens (Havens). In his cross appeal, Havens requests this court to reverse the trial court's orders dismissing Havens' wrongful discharge and negligent misrepresentation claims, excluding certain evidence, and to modify the award of attorneys' fees and costs and pre- and postjudgment interest. We reverse and remand for a new trial.

Lamar Havens was hired by C&D on October 23, 1986, to set up and manage Northwest Composites, a Washington division of the California corporation. The hiring was the culmination of two discussions between James Downey, owner and chief executive officer of C&D, Joseph Moran, president of C&D, and Havens. The meetings were informal, and the discussions memorialized only in a set of notes.

Following an oral agreement of employment, Havens wrote a confirming letter. Havens understood he had a 1-year contract with C&D, at a salary of $70,000 per year and a $15,000 guaranteed bonus. C&D does not dispute it hired Havens, but insists it did not hire Havens for any specified period. The parties agree that they never discussed the issue of just cause for dismissal. Havens left his position at Heath Tecna, where he earned $56,000 annually, and went to work for C&D on October 28, 1986.

Havens was responsible for getting C&D's Northwest Composites division up and running in Marysville, Washington. This included finding a plant site, locating equipment, and hiring and training personnel. Havens kept a business diary of these activities and his feelings about his position with C&D. Testimony by Downey, Moran and Havens indicates several disagreements between the parties about Havens' performance. Four incidents are important to this appeal:

1. Havens hired a friend for the plant maintenance position, at $32,000 per year when C&D employees in California performing the same job were paid $20,000 per year. Downey rebuked Havens for paying too much. In response, Havens "dehired" his friend.

2. Moran sent Tim Johnson, a C&D quality control assistant, to Havens to interview for the quality control manager position. Havens told Johnson he was not qualified for the position, and offered him an assembly line position instead.

3. Havens chose an electrical contractor to install equipment at the plant because installation involved getting an electrical permit and running conduit. Downey told Havens not to hire the contractor, that a C&D employee would install the equipment, and that a permit was not required.

4. Havens told Downey that Boeing should be informed of the new plant prior to shipping or manufacturing, which would give Boeing time to inspect and certify the plant as part of its quality control program. Downey disagreed, and told Havens not to worry about it. Havens followed Downey's instruction.

These incidents illustrate what Havens refers to as C&D's interference with his "promised authority". C&D views these incidents as illustrative of Havens' inability to accept directives from his superiors (Downey and Moran) and the difference in philosophy between Havens and Downey.

C&D discharged Havens on February 3, 1987, because "the chemistry with us does not mix well at all. We are appreciative of your effort but the differences we feel are irreconcilable." C&D promised him 3 months' severance pay, with an additional 3 months' severance pay if he had not found employment by then.

Havens filed suit when C&D terminated severance payments after 6 weeks in response to Havens' threat to file suit. Havens alleged (1) breach of a 1-year contract, (2) a right of permanent employment with discharge only for just cause based on promissory estoppel, (3) wrongful discharge, (4) negligent misrepresentation, (5) age discrimination, (6) defamation, and (7) breach of the Consumer Protection Act. Prior to trial, Havens voluntarily dismissed the defamation and Consumer Protection Act claims, and the court granted C&D's motion to dismiss the wrongful discharge claim. At the end of Havens' case, the court also granted C&D's motion to dismiss the negligent misrepresentation claim.

The jury rendered a special verdict awarding damages for breach of a 1-year contract ($65,901), breach of the severance pay agreement ($26,900) and for discharge without just cause ($363,958) based on promissory estoppel, but found no age discrimination.

The trial court denied C&D's motion for judgment n.o.v. or, alternatively, a new trial, on the promissory estoppel claim.

ISSUES

1. Did the trial judge err in refusing to dismiss the promissory estoppel claim where there was a valid and enforceable employment contract?

2. If promissory estoppel does apply, is there substantial evidence in this case that C&D made a promise of some-

thing other than terminable-at-will employment to Mr. Havens?

3. Did the trial judge err in instructing the jury?

4. Did the trial judge err in excluding certain evidence?

5. Was it error for the trial judge to dismiss Havens' wrongful discharge claim (cross appeal)?

6. Was it error for the trial judge to dismiss Havens' negligent misrepresentation claim (cross appeal)?

7. Was it error for the trial judge to dismiss Joseph Moran individually after the jury verdict (cross appeal)?

8. Did the trial judge correctly calculate attorney fees and prejudgment interest?

### PROMISSORY ESTOPPEL

C&D contends that the doctrine of promissory estoppel is not applicable to the facts of this case and that the jury verdict based thereon must be set aside. The Restatement (Second) of Contracts § 90 (1981) is the classic statement of the doctrine of promissory estoppel.

Promise Reasonably Inducing Action or Forbearance
(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

C&D argues that promissory estoppel could never arise from negotiations for an employment contract which culminate in an express contract of employment. Certainly, such a case would be unusual, but we find it unnecessary to ·decide whether a case could arise where the promises which form the basis for promissory estoppel are so distinct from the promises of the express contract, and where the promisee's action in reliance on the estoppel promises is so distinct from his action pursuant to the express contract that an action for promissory estoppel would lie. Clearly, that is not this case.

As stated in *Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 885, 790 P.2d 1258 (1990) (citing J. Calamari & J.

Perillo, *Contracts* § 6.1 (3d ed. 1987) (citing Restatement of Contracts § 90 (1952))):

> The doctrine of promissory estoppel was developed to cover certain situations in which consideration is lacking, but enforcement of the promise is appropriate because the promisor reasonably should expect the promise to induce detrimental reliance on the part of the promisee.

The court there rejected a promissory estoppel claim when an employee transferred from one position to another with the same employer. The court held that the employee's agreement to transfer, like Havens' agreement to come to work, furnished consideration. Therefore, if there was any obligation, it would not be based on promissory estoppel but on an express contract. Not even Havens asserts that the elements of an express contract are present here.

Further, the record does not support a finding of a promise of indefinite employment subject to discharge only for cause. Havens concedes that C&D never made such an express promise. We agree with the trial court that liability could follow statements which, while not in the form of a promise, convey the same meaning of a firm undertaking to act in a certain way. Even such statements are absent. As explicitly stated in the Restatement, mere understandings or expectations by the promisee are insufficient. What is required is that the promisor should "reasonably expect to induce action". The statements relied upon by Havens fall far short of that requirement. For example, Joseph Moran's testimony:

> Q: Did you or Downey say something like, "We're going to be together for a long time, LaMar"?
> A: I don't remember that.
> Q: Something about looking forward to a long and prosperous relationship?
> A: We were looking forward to working with LaMar Havens.
> Q: How about "a long and prosperous relationship"?
> A: Oh, I hope I said that.

Havens testified that C&D was "looking for a good long-term relationship." This and other statements relied upon all are consistent with the general expectation which would be pres-

ent in any such negotiation: that the employer was hoping and, indeed, expecting, a mutually satisfactory and long-term relationship. That is a far cry from any unequivocal promise (or statement equivalent thereto) that Havens would be employed until retirement and could only be terminated for just cause. Indeed, Havens' own testimony demonstrates that there was not even any mention as to termination. "There was no down-side risk discussed. There was no discussion of anything but what was on the up-side. Nothing was discussed about what *if something went bad or there were problems.*" (Italics ours.) He never requested a fixed term employment contract and he admitted that no one ever told him there was such an agreement. His letter confirming the terms of employment orally agreed upon does not even suggest, much less state unequivocally, that any such unusual agreement had been reached. In *Siekawitch v. Washington Beef Producers, Inc.*, 58 .Wn. App. 454, 462, 793 P.2d 994 (1990) the court stated: "[o]nly when the parties specifically bargain for security will the law require just cause for termination." In *Lawson v. Boeing Co.*,[1] this court found repeated oral promises that the employee would retain his position so long as job performance met a certain level. The court held the oral promises were insufficient to create an issue of material fact as to a contract of continued employment. In *Hatfield*, there was specific mention of a period of 3 to 5 years and additional work beyond. Yet the court held that the statements were too indefinite to constitute a promise of continued employment.[2] In both these cases the language relied upon

---

[1] 58 Wn. App. 261, 792 P.2d 545 (1990), *review denied*, 116 Wn.2d 1021 (1991).

[2] Hatfield recalled that his employer made the following statement: "While we can't tell exactly what's going to happen to any of us in the future, I perceive this job as being ongoing for the next three to five years; that after the conversion is over there is the position of loan department liaison . . . [P]lus there will be the coordinating of the conversion of some of our branches and some of our subsidiaries . . . I can see this ongoing for a period of three to five years. . . . And the way we have seen the industry grow and knowing that as soon as we install a system it's antiquated, . . . we'll start the same process over again at the end of three to five years." *Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 878, 790 P.2d 1258 (1990).

was much more favorable to the employee's claim than in the present case. The evidence here does not support an agreement of indefinite employment, subject to discharge only for just cause.

Accordingly, the court erred in submitting promissory estoppel to the jury and should have granted C&D's motion to eliminate that portion of the verdict from the judgment.

## HAVENS DIARY

C&D contends that the entries from Havens' diary were admissible as substantive evidence and that the limitations on their use imposed by the court constitutes reversible error.[3] We agree.

■ Havens offers four reasons to affirm the trial court's ruling.[4] First, he contends that these entries are not relevant to the issue of "just cause" since the appellants could not have relied upon them at the time of the discharge decision. It is correct that an employer may not state one ground for discharge and then at trial rely on a different ground. For example, if an employee was terminated for unexcused absences, the employer may not defend at trial that the employee made unauthorized use of the employer's property. What Havens ignores is that the employer may rely on a new witness or new documentary evidence to prove that the absences took place and were unexcused. Here, "bad chemistry" was the stated basis for termination. While C&D could not rely at trial on abuse of an expense account, for example, it is not prevented from adducing further evidence that, in fact, there was "bad chemistry". Where a top

---

[3] In response to a motion in limine, the trial judge ruled Havens' diary could be used only for the purposes of refreshing Havens' recollection and impeaching Havens. However, the judge severely restricted C&D's attempts to impeach Havens with individual diary entries.

[4] At one point the court seemed to believe that the entries were hearsay and not admissible as admissions because not communicated. Although Havens does not urge this ground, we note that statements need not be communicated to be admissions, and if the statements are admissions, are admissible as an exception to hearsay rules. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1190, 1242-43 (E.D. Pa. 1980).

level employee is terminated for "bad chemistry", his private attitudes about his employers, and his understanding of their attitudes and their directions to him, are highly relevant to whether or not the "bad chemistry" existed.

The second reason urged is that diaries are generally inadmissible as substantive evidence, citing *State v. Coffey.*[5] The authority is inapposite. The diary here was not offered as a business record under RCW 5.45.020, as in *Coffey.* Excerpts of Havens' diary were offered as admissions against interest and to establish Havens' state of mind.

Thirdly, Havens argues that even if it was error to exclude the diary entries, reversal is not required because the entries were cumulative of testimony given which acknowledged the differences of opinion. We are not persuaded. Statements made contemporaneously in the privacy of a diary are compelling evidence, if not indeed the best possible evidence, as to Havens' thoughts about his employer, his knowledge of his employer's expectations, and his attitude in following directions. Such statements displayed on exhibit boards in cross examination and argument are a far cry from the very limited use permitted by the court here. For example, Havens' grudging admission that he may have said to Joe Moran, "I can't fault you for a decision" has a very different impact on a jury than the unqualified statement in the diary, "I told [Joe Moran] I could or did not fault the decision because we had obvious differences." The respective attitudes of the employer and the employee were essential to the jury's determination of just cause. The exclusion was especially prejudicial because Havens was allowed to use the diary to refresh his memory. A jury would naturally assume there was nothing adverse to Havens' trial position in the diary when they heard nothing to the contrary from C&D.

Finally, Havens contends that even if the statements were admitted they could not have been considered by the jury because of instruction 19.[6] The instruction was, of course,

---

[5]8 Wn.2d 504, 112 P.2d 989 (1941).

[6]"In determining whether the defendants had just or good cause for discharging the plaintiff, you should consider only those facts known to the defendants at

given after the evidence had been excluded, so it is pure speculation as to whether the instruction would have been given over objection with the diary entries in evidence. Additionally, Havens again overlooks the distinction between evidence in support of the stated cause for discharge and evidence of a new cause.

■ The court erred in limiting C&D's use of the diary. The issue of just cause for termination was hotly disputed. We are unable to say that the jury might not have reached a different conclusion if C&D had been allowed full use of the diary's entries.[7] This error affects the jury's determination of the breach of the 1-year contract, requiring a retrial of that issue.

## "HIGH RANKING EMPLOYEE" INSTRUCTION

C&D assigns error to the court's refusal to give its "high ranking employee" instruction defining the test for permissible discharge. Although retrial is necessary in any event, we address the issue since the instruction may well be presented again. The court gave the following definition of just cause in instruction 18:

> Just cause, or good cause, for the purposes of these instructions, is defined as a fair and honest reason for dismissal, exercised in good faith on the part of the party exercising the power. A discharge for just or good cause is one that is based on facts that (1) are supported by substantial evidence; (2) are reasonably believed by the employer to be true; and (3) are not for any arbitrary or capricious or illegal reason.

C&D proposed the following instruction:

> In deciding whether C&D had "good cause" or "just cause" to terminate the plaintiff, substantial weight must be given to managerial discretion. In determining what is "good cause" or "just cause" to support termination of a high-ranking employee,

---

the time of discharge. Facts discovered after an employee's termination, and in the course of a law suit may not be used to justify a prior discharge." Instruction 19.

[7]For the same reason, Guy Eden's testimony as to statements about Havens' opinions of his employers would be admissible. We do not need to address the question as to whether C&D properly preserved its claimed error as to Eden's testimony since we are remanding for a new trial.

an employer is entitled to consider such intangible attributes as personality, initiative, ability to function as part of a management team and ability to motivate subordinates.

*Defendant's proposed instruction 16.* The trial judge denied C&D's just cause instruction because he thought the instruction proposed was encompassed in the court's instruction 18. It was not. The court's language "arbitrary or capricious or illegal" does not contain any reference to managerial discretion or consideration of initiative, or *ability to function as part of a management team.* A jury might reasonably find "just cause" under C&D's proposed instruction but not under the court's. Specifically, "bad chemistry" seems to be a shorthand description of inability to function as part of a management team.

■■ Havens points out that not only is there no such Washington Pattern Instruction, but also no Washington case has held that such instruction is required. However, it is undeniable that there is an enormous difference between the "just cause" for terminating a high level manager and the "just cause" for terminating an assembly line or low level clerical employee. Although not addressed in Washington, this distinction has been recognized by academic commentators.[8]

---

[8]C&D's proposed instruction is supported by law review commentaries, case law and common sense. A Harvard Law Review note sympathetic to employees states:

> What constitutes bad faith in terminations for unsatisfactory job performance may vary from case to case because employment at will arrangements cover a broad spectrum of occupations. For example, with high-level managers the standard of satisfactory job performance, and thus the test of what constitutes wrongful discharge, becomes increasingly subjective. Efficient running of an enterprise demands a high degree of trust and cooperation among top personnel; thus, upper echelon employees should perhaps have to overcome a higher hurdle to show that their discharge was abusive or retaliatory.

(Footnote omitted.) Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty To Terminate Only in Good Faith*, 93 Harv. L. Rev. 1816, 1840 (1980). Similarly, another author states:

> The higher ranking the employee, the more important to the success of the business is his effective performance. Compounding the potential for undue inhibition of the employer's judgment at the higher echelons of employment is

C&D cited *Pugh v. See's Candies, Inc.*, 203 Cal. App. 3d 743, 250 Cal. Rptr. 195 (1988), as support for its proposed instruction. In *Pugh* the trial court gave an instruction that "where, as here, the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of its subjective judgment." *Pugh*, 203 Cal. App. 3d at 761. On appeal the court approved this instruction, stating:

> In any free enterprise system, an employer must have wide latitude in making independent, good faith judgments about high-ranking employees without the threat of a jury second-guessing its business judgment. Measuring the effective performance of such an employee involves the consideration of many intangible attributes such as personality, initiative, *ability to function as part of the management team* and to motivate subordinates, and the ability to conceptualize and effectuate management style and goals. Unlike the employee with routine or mechanical duties whose performance can be measured by an objective standard, a management employee's unsatisfactory performance is often difficult to pinpoint precisely, and the reasons for his or her discharge may be difficult to articulate. Although the jury must assess the legitimacy of the employer's decision to discharge, it should not be thrust into a managerial role.

(Citations omitted. Italics ours.) *Pugh*, 203 Cal. App. 3d at 769. C&D's proposed instruction closely followed this quote from *Pugh*. We agree with these views.

To a considerable extent, the risk that those in control of a business will become subjectively dissatisfied with a high level employee's performance goes with the job. Indeed, Havens' diary comment seems to recognize that subjective dissatisfaction was grounds for termination even in the

---

the greater difficulty of articulating the basis for a discharge at that level. Compared to the wage earner, whose routine duties can generally be measured against a mechanical standard, the value of the salaried employee is more likely to be measured in such intangible qualities as imagination, initiative, drive, and personality. *The employer's evaluation of the higher ranking employee is usually a highly personalized, intuitive judgment, and, as such, is more difficult to translate into concrete reasons which someone else — a juryman — can readily understand and appreciate.*

(Italics ours.) Blades, *Employment At Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 Colum. L. Rev. 1404, 1428 (1967).

absence of a clear-cut breach of company rules or policy.[9] Although there no doubt can be an improper discharge of high level employees, the courts must be extremely careful in letting juries second-guess those responsible for the success or, indeed, the survival of a business enterprise. Individuals such as Havens are in a position to negotiate satisfactory terms of employment and are far less in need of protection against improper discharge than the assembly line or low level clerical worker. The limitations developed on the basic at-will employment relationship have, to a considerable extent, been based on employment manuals and patterned on the provisions of union contracts and civil service regulations.[10] It is significant that neither of these types of protection are extended to employees in positions such as Havens'. Nor is any manual applicable in this case. These considerations require an instruction describing the kind of conduct justifying termination for a high level manager.

It is unnecessary to formulate a test as to what constitutes a "high level employee", since by any standard Havens plainly qualifies as such. Havens was in charge of a substantially independent operation employing approximately 200 employees and over 1,000 miles from his supervisors at corporate headquarters. It is also undesirable at this point to formulate a definitive statement of acceptable grounds for discharge of a "high level employee". Each case will turn in considerable measure on its own facts and the nature of the stated grounds of discharge. Here, in essence, the discharge was stated by

---

[9]"I told him I could or did not fault the decision [to discharge me] but that the timing for me was bad. I had left a secure position with Heath and that a new job was not going to be easy to get."

[10]When an employer puts its employment policies in the form of an employee handbook and distributes the policies to its employees, Washington courts have held the employers should expect that employees will rely on the handbooks' content to their detriment. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984); *Lawson v. Boeing Co.*, 58 Wn. App. 261, 792 P.2d 545 (1990), *review denied,* 116 Wn.2d 1021 (1991); *Siekawitch v. Washington Beef Producers, Inc.*, 58 Wn. App. 454, 793 P.2d 994 (1990); *Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 790 P.2d 1258 (1990).

C&D Plastics as "bad chemistry". Such bad chemistry might well constitute proper discharge for Havens, whereas the same degree of bad chemistry might not constitute "just cause" for discharge of an assembly line employee whose terms of employment require just cause for termination. We conclude that the court's instruction, while legally correct, is insufficient to allow C&D to adequately argue its just cause basis for dismissal of an employee in Havens' position. Upon retrial C&D is entitled to an instruction in substantially the language it requested.

## SEVERANCE PAY

The jury awarded damages for breach of the severance pay agreement in the amount of $26,900. C&D assigns no error to the award, nor to the instructions on which it is based, and makes no argument on this issue in its briefs. Where the appellant does not assign error to a finding or conclusion, this court will not consider the issue on appeal.[11] The award becomes the law of the case.

Although not briefed or argued, we note a significant consequence of this ruling. If Havens fails to prevail on retrial as to just cause for termination, he is still entitled to the severance pay award of $26,900. If he does prevail, he is entitled to the sum of $65,901 for breach of the employment contract pursuant to the jury verdict.[12] However, if he recovers on his contract claim, the severance pay should be subsumed within the judgment thereon, since the basis of the severance pay offer was that Havens would have no income after termination until he found new employment. To allow a severance award, in addition to wages for the balance of his 1-year employment contract, would permit a double recovery.

## HAVENS CROSS APPEAL

In his cross appeal Havens asserts seven errors: (1) the court's granting a motion in limine excluding evidence assert-

[11]RAP 10.3(g).

[12]C&D has assigned no error to this jury award nor addressed any argument to the issue in the briefs and, accordingly, it is also the law of the case.

ing a violation of C&D's obligations under the Boeing contract and evidence as to failure to get an electrical permit; (2) dismissing Havens' wrongful discharge claim; (3) dismissing Havens' negligent misrepresentation claim; (4) failure to allow prejudgment interest on the promissory estoppel verdict; (5) dismissing Joseph Moran after the close of all the testimony; (6) error in fixing plaintiff's attorney fees; and (7) error in failing to compute interest on the promissory estoppel claim from the date of verdict rather than from the date of judgment. Since the case is being remanded for retrial solely on the breach of contract claim for 1 year's employment, assignments of error 4 and 7 need not be addressed. Nor need we address the claimed error in attorney fee calculations, other than to note that if Havens prevails on retrial he will be entitled to attorney fees only on his successful claim and not on his unsuccessful claims.[13]

▇▇▇▇ Havens' assignments of error 1 and 2 will be discussed together because they present the same basic issue: do the facts generate a jury issue on wrongful discharge in violation of public policy?[14] Havens offered to prove that C&D violated public policy when it (1) failed to get Boeing quality control certification of the Northwest composite plant and (2) failed to get an electrical permit prior to installing a piece of equipment in the plant. As to Boeing certification, Havens is unable to demonstrate that C&D violated any directly applicable statute or regulation. At most he offered to show a violation of a contract with Boeing, which is a far

---

[13]*Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 450, 815 P.2d 1362 (1991).

[14]The facts here are a far cry from cases in which a violation of public policy has been found. *See, e.g., Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 821 P.2d 18 (1991) (discharged in retaliation for filing workers' compensation claim); *Bennett v. Hardy*, 113 Wn.2d 912, 784 P.2d 1258 (1990) (discharge violated laws against age discrimination); *Cagle v. Burns & Roe, Inc.*, 106 Wn.2d 911, 726 P.2d 434 (1986) (discharge in retaliation for employee's threat to report violations at Hanford Nuclear Reservation to the Nuclear Regulatory Commission); *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984) (discharge because the employee instituted an accurate accounting system required by a federal law designed to prevent bribery of foreign officials).

cry indeed from a "clear mandate of public policy." *Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989). Nor are we persuaded that every statutory or administrative requirement for a permit constitutes a clear mandate of public policy for the purposes of wrongful discharge actions. Assuming that C&D had violated such policies, that alone is of no avail to Havens. A discharge on the basis of race establishes a case of wrongful discharge. Here the discharge does not per se implicate public policy. Havens must go on to establish that he personally refused to implement a company program that violates "public policy" and was fired therefor. There is no showing that Havens even communicated his opposition to these "violations", much less that such opposition was the cause of his termination. This is not a whistle-blowing case,[15] nor a discharge based on failure to follow orders.[16] We agree with the trial judge that Havens has totally failed to show the required nexus between his discharge and any claimed violation of public policy. Thus, the exclusion of evidence on this issue was proper.

Havens contended as a basis for his negligent misrepresentation claim that C&D made promises "recklessly or negligently, . . . with the knowledge, and intent, that plaintiff would rely upon them." Havens does not identify any false statements as required by the Restatement (Second) of Torts § 552 (1977), which is the accepted formulation in Washington.[17] It is extremely doubtful that this section is even applicable to statements incident to formation of a contract. The statements relied upon for this cause of action are exactly the same statements which form the basis for

---

[15]*Dicomes v. State*, 113 Wn.2d 612, 782 P.2d 1002 (1989).

[16]*Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 807 P.2d 830 (1991).

[17]"One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information[.]" *Haberman v. WPPSS*, 109 Wn.2d 107, 161-62, 744 P.2d 1032, 750 P.2d 254 (1987) (citing Restatement (Second) of Torts § 552(1) (1977)), *appeal dismissed*, 488 U.S. 805 (1988).

Havens' promissory estoppel claim. We agree with the trial judge that this is another label, and an incorrect one, for the same facts. For the reasons set forth in our discussion of promissory estoppel, we find the facts are insufficient to justify submitting the issue of negligent misrepresentation to a jury.

██ Havens assigns error to the posttrial dismissal of Joseph Moran as a party. We fail to see the importance of this to Havens' case but, in any event, we find no error. CR 50(b) allows motions for judgment n.o.v. within 10 days of the entry of judgment. The applicable rule is that:

> when, viewing the evidence in the light most favorable to the nonmoving party, the court can say as a matter of law that the verdict is not supported by substantial evidence.

*Pannell v. Food Servs. of Am.*, 61 Wn. App. 418, 440, 810 P.2d 952, 815 P.2d 812 (1991) (citing *Cowsert v. Crowley Maritime Corp.*, 101 Wn.2d 402, 680 P.2d 46 (1984)). Moran's involvement was solely in his capacity as president of C&D, and no basis is shown for an exception to the general rule that an agent acting within the scope of his authority and in contractual matters is not individually liable.[18] The court's ruling was correct.

## RETRIAL

██ It is well settled that when an error requires reversal on one issue before the court it is not necessary to retry other issues that were fairly resolved and unaffected by the error in question.[19] C&D concedes that the evidence justified the jury finding a contract for 1 year and thus that Havens

---

[18]*Griffiths & Sprague Stevedoring Co. v. Bayly, Martin & Fay, Inc.*, 71 Wn.2d 679, 686, 430 P.2d 600 (1967).

[19]"An appellate court may, no doubt, where the error in the trial relates to a particular issue only, which does not depend for its proper understanding or trial on other issues presented, reverse and remand the cause for trial on the particular issue erroneously tried, and on that issue alone." *Godefroy v. Reilly*, 140 Wash. 650, 657, 250 P. 59 (1926). *Cf. Mina v. Boise Cascade Corp.*, 104 Wn.2d 696, 707, 710 P.2d 184 (1985) (where the jury separately determined liability and damages on a special verdict form, and both parties presented evidence on damages, retrial limited to the issue of liability is proper).

could be discharged only for just cause within that period, and does not challenge the jury's damage award therefor. Thus, there is no need to retry these issues. However, the improper limitation of C&D's use of the diary may have affected the jury finding on just cause, which does require retrial. Because the amount of contract damages is liquidated, the court's allowance of prejudgment interest was correct.[20]

On the facts of this case we find that the only issue that requires retrial is whether C&D had just cause to discharge Havens.

Remanded for further proceedings consistent with this opinion.

SCHOLFIELD and COLEMAN, JJ., concur.

Reconsideration denied May 11, 1993.

Review granted at 122 Wn.2d 1023 (1993).

---

[20]Obviously, if Havens prevails on retrial, the prejudgment interest would run to the date of entry of the new judgment.