[No. A021348. First Dist., Div. Three. Aug. 10, 1988.]

WAYNE K. PUGH, Plaintiff and Appellant, v.
SEE'S CANDIES, INC., et al., Defendants and Respondents.

**COUNSEL**

Joseph P. Stretch, Niesar, Moody, Hill, Kregstein & Hamilton and Richard P. Hill, for Plaintiff and Appellant..

Joseph Posner, John C. Shaffer, Jr., Kaye Rochlin and Leroy S. Walker as Amici Curiae on behalf of Plaintiff and Appellant.

Donald F. Farbstein, Farbstein & Brown, Phillip J. Smith and Smith, Wright, Peterson & Chapla for Defendants and Respondents.

Michael J. Breining, Sheppard, Mullin, Richter & Hampton, David S. Bradshaw, Tracy Thompson and Barbara C. Stikker as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BARRY-DEAL, J.**—Following retrial of his action for wrongful discharge, appellant, an at-will employee, again appeals from the judgment entered after the jury returned a general defense verdict for See's and the union[1] and after the court denied appellant's motion for a new trial. In the first appeal, a judgment for defendants was reversed by this court in a published opinion, *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917] (hereafter *Pugh I),* holding that the trial court erroneously granted defendants' motion for nonsuit.[2]

Appellant now contends that the court committed prejudicial error in its evidentiary rulings and in instructing the jury in the second trial, in which he urged both contract and tort theories to support recovery for wrongful discharge. We find no reversible error and affirm the judgment.

### I. *The First Trial*

Appellant, after 32 years of employment with See's, occupied a managerial position as a corporate officer and member of the board of directors of the subsidiary corporation when he was summarily discharged without prior notice. (*Pugh I, supra,* 116 Cal.App.3d at pp. 315-319.) Asserting that his involuntary termination was a breach of contract and against public policy, appellant filed an action against his former employer for wrongful discharge

---

[1] See's South San Francisco plant, operating under the name See's Candies, Inc., is a wholly owned subsidiary corporation of See's Candy Shops, Inc., which operates the Los Angeles plant. The stock of See's Candy Shops, Inc., was sold by the See family in 1972 to Blue Chip Stamps Corporation. In this opinion the name "See's" refers to See's Candies, Inc. See's Candy Shops, Inc., was not a defendant on retrial.

Respondent Baker's Local No. 125 is the successor to Candy Worker's Local No. 158, also named as a defendant. The term "union" is used to describe the organization as a continuing entity.

[2] We also issued a writ of mandate in an unpublished opinion, *Pugh* v. *Superior Court* (May 24, 1982) A017057 (1 Civ. 54759), directing the San Mateo County Superior Court to vacate its order denying Pugh's motion for relief from waiver of a jury trial and to enter an order permitting the jury trial.

and joined as a defendant the union, which he alleged had conspired with the employer in the wrongful conduct; he sought compensatory and punitive damages. (*Id.,* at pp. 315, 322.)

The trial court granted defendants' motion for nonsuit at the close of appellant's case-in-chief. In reversing, the *Pugh I* court viewed appellant's evidence in the light most favorable to appellant, as it must in reviewing a nonsuit, and determined, without reaching the merits of the action, that appellant had established a prima facie case of wrongful discharge based on the employer's breach of an implied-in-fact contractual promise not to dismiss him except for good cause. (*Pugh I, supra,* 116 Cal.App.3d at pp. 327, 329.) Evidence of the union's participation in inducing breach of contract, though not "weighty," was held sufficient to withstand nonsuit. (*Id.,* at pp. 330-331.)

Before reaching this conclusion, Justice Grodin, writing for the *Pugh I* court, reviewed the legal history of the employment relationship and the erosion of the employer's absolute right to discharge an employee, which has been curtailed by the Legislature in a variety of ways.[3] (*Pugh I, supra,* 116 Cal.App.3d at pp. 319-322.) Collective bargaining agreements, covering a relatively small percentage of the work force, protect union employees from discharge without "just cause." Public employees are protected by civil service rules and due process. All employees are statutorily protected from discharge for a variety of reasons, including union activity, discrimination, and political affiliation. Although the Legislature has not adopted statutes providing more generalized protection for at-will employees against unjust dismissal, two limitations on the employer's absolute right to discharge have developed judicially, "one of them based upon public policy and the other upon traditional contract doctrine." (*Id.,* at p. 322.)

The *Pugh I* court first considered the public policy limitations on employee discharges articulated in *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], in which an at-will employee with 15 years of service sued his employer for wrongful discharge when he was fired for refusal to participate in an illegal price-fixing scheme in violation of the antitrust laws. *Tameny* held that such a discharge in violation of a statute or fundamental public policy would support a tort action against the employer. ■ In *Pugh I* the court rejected appellant's contention that the evidence tended to show he was terminated because he refused to participate in negotiations for an illegal

---

[3] See generally, 2 Witkin, Summary of California Law (9th ed. 1987) Agency and Employment, section 289 et seq., page 286 et seq.; Note, *Defining Public Policy Torts in At-Will Dismissals* (1981) 34 Stan.L.Rev. 153, 156-157, footnotes 11-13 and accompanying text (hereafter *At-Will Dismissals*).

union contract and held that the evidence was insufficient to establish a prima facie case for retaliatory discharge under *Tameny*. (*Pugh I, supra,* 116 Cal.App.3d at pp. 322-324.) Therefore, the nonsuit on this cause of action was an adjudication on the merits under Code of Civil Procedure section 581c (now section 581c, subd. (c), as amended in 1980), and this action could not be urged on remand. (See *American Broadcasting Companies, Inc.* v. *Walter Reade-Sterling, Inc.* (1974) 43 Cal.App.3d 401, 406 [117 Cal.Rptr. 617]; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 422, p. 422.)

The *Pugh I* court then turned its attention to the contract limitations on the employer's absolute right to discharge an at-will employee. It considered a "related doctrinal development" of an action based on breach of the covenant of good faith and fair dealing espoused in *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443,[4] and concluded, correctly we think, that the result in *Cleary* was "equally explicable in traditional contract terms: the employer's conduct gave rise to an implied promise that it would not act arbitrarily in dealing with its employees." (*Pugh I, supra,* 116 Cal.App.3d at p. 329.) Although the *Cleary* court held that the employer's breach of the covenant of good faith and fair dealing would support an employee's action in either tort or contract (*Cleary, supra,* 111 Cal.App.3d at p. 456), it did not delineate the elements of a tort action nor discuss the rationale for allowing a tort remedy. Because the *Pugh I* court found it unnecessary to consider such an action, it did not negate a tort theory for appellant's use on remand. (*Pugh I, supra,* 116 Cal.App.3d at p. 329; see also *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290, 304 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015] [where Justice Grodin, writing for the court, again found it unnecessary to decide whether complaint stated cause of action for breach of the covenant].) Therefore, appellant was not foreclosed by Code of Civil Procedure section 581c (prior adjudication on the merits) from advancing this theory on retrial. (See 7 Witkin, Cal. Procedure, Trial, *supra,* § 422, p. 422.)

Then, for retrial, the *Pugh I* court spelled out a basic contract theory for a cause of action for breach of an implied-in-fact employment contract

---

[4]In *Cleary,* an employee with 18 years of service sued his employer for wrongful discharge and breach of the implied covenant of good faith, alleging that his discharge for the stated reasons of theft, unauthorized leave from his work area, and threats to another employee was pretextual. He alleged that the actual reason was his engaging in union activity and that his discharge was in violation of the employer's dismissal policies set forth in its own regulations.

The court acknowledged that in charging a pretextual firing for union activity, the employee had alleged a tort action for retaliatory discharge under *Tameny,* but held that even if Cleary could not prove that cause of action, he had an action for breach of the good faith covenant. (*Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d at p. 455.) The court analyzed the facts in contract terms, cited breach of contract cases and a dictum from *Tameny,* but nevertheless held that the employee had an action sounding in both tort and contract. (*Id.,* at p. 456; see *At-Will Dismissals, supra,* 34 Stan.L.Rev. at pp. 160-161, fn. 29.)

containing the employer's promise not to discharge an at-will employee without good cause. In doing so, it relied on expanded contract theories to dispose of several limitations in long-established contract and statutory law. (See Rohwer, *Terminable-At-Will Employment: New Theories for Job Security* (1984) 15 Pacific L.J. 759, 768-770 (hereafter *New Theories*).)

The court acknowledged the common law rule, based on the concept of mutuality and codified in Labor Code section 2922, that employment for an unspecified term may be terminated at the will of either party on notice to the other. It held, however, that the statute creates only a presumption that an employment is terminable at will. This presumption is subject to contrary evidence, which may take the form of an express or implied agreement that "the employment relationship will continue indefinitely, pending the occurrence of some event such as the employer's dissatisfaction with the employee's services *or* the existence of some 'cause' for termination." (*Pugh I, supra,* 116 Cal.App.3d at pp. 324-325, fn. omitted, italics added.)

The court reasoned that there is no requirement of mutuality of obligation if the requirement of consideration is met. (*Pugh I, supra,* 116 Cal.App.3d at p. 325.) The theory that an employer's promise for continued employment is terminable at will unless supported by an independent consideration other than services rendered or to be rendered is contrary to the general contract principle that courts should not inquire into adequacy of consideration. The " 'independent consideration' " requirement at most serves an evidentiary function, that is, it is more likely that the parties intended a continuing relationship with limitations on the employer's right to discharge when the employee has given some benefit to the employer or suffered some detriment, other than providing services. (*Id.,* at pp. 325-326.) Thus, employment contracts " '. . . are terminable only for good cause if *either* of two conditions exist: (1) the contract was supported by consideration independent of the services to be performed by the employee . . . ; or (2) the parties agreed, expressly or impliedly, that the employee could be terminated only for good cause.' [Citations.]" (*Id.,* at p. 326, italics added by the *Pugh I* court; see also *Hillsman* v. *Sutter Community Hospitals* (1984) 153 Cal.App.3d 743, 751-753 [200 Cal.Rptr. 605].)

The *Pugh I* court stated that a variety of factors have been found to support the formation of an implied-in-fact contract to discharge only for good cause: "the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged." (*Pugh I, supra,* 116 Cal.App.3d at p. 327, fns. omitted; see also *id.,* at p. 329.) By implication, this means that the terms of the implied agreement can be developed over the course of

the employment relationship and are not necessarily fixed by the understanding at the inception of that relationship. (See Note, *Implied Contract Rights to Job Security* (1974) 26 Stan.L.Rev. 335, 367, fn. 209.)

As guidance to the trial court on remand, the court discussed the evidentiary burdens. After an employee establishes a prima facie case of breach of the implied employment contract, the employer has the burden of going forward with the evidence to show the reason for the discharge. The employee may then attack the employer's proffered explanation either on the ground that it is pretextual and that the real reason is one prohibited by the contract or public policy, or on the ground that it is insufficient to meet the employer's contract or legal obligations. The employee, however, has the ultimate burden of proving that he or she was wrongfully terminated. (*Pugh I, supra,* 116 Cal.App.3d at pp. 329-330; cf. *Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 252-256 [67 L.Ed.2d 207, 214-217, 101 S.Ct. 1089] [gender discrimination].)

The standard by which the employee's burden is to be measured will depend on the jury's conclusions about the nature of the contract. The court noted that " 'just cause' " and " 'good cause' " have been difficult to define and depend on the circumstances of each case. "Essentially, they connote 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' [Citation.] Care must be taken, however, not to interfere with the legitimate exercise of managerial discretion. . . . And where, as here, the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment. [Citation.]" (*Pugh I, supra,* 116 Cal.App.3d at p. 330, fn. omitted.)

The *Pugh I* court did not reject the rule in Labor Code section 2922 that an at-will employment can be terminated by either party without cause, but it did advance an enlightened interpretation of the rule, thereby enabling a private sector, nonunion, at-will employee to seek a contract remedy for unjust discharge. (See generally, *New Theories, supra,* 15 Pacific L.J. 759; Miller & Estes, *Recent Judicial Limitations on the Right to Discharge: A California Trilogy* (1982) 16 U.C. Davis L.Rev. 65; Louderback, *Standards for Limiting the Tort of Bad Faith Breach of Contract* (1982) 16 U.S.F. L.Rev. 187; Comment, *Reconstructing Breach of the Implied Covenant of Good Faith and Fair Dealing as a Tort* (1985) 73 Cal.L.Rev. 1291; *At-Will Dismissals, supra,* 34 Stan.L.Rev. 153.)

## II. *Theories*[5] *and Evidence at Second Trial*

At the second trial in late 1982, appellant relied on both the breach of contract theory of *Pugh I* and the tort theory announced in *Cleary* to support recovery of both contract and tort damages, including punitive damages, against See's.[6] The trial court allowed appellant to seek tort damages under *Cleary* for breach of the covenant of good faith and fair dealing even though See's challenged the existence of such a tort theory outside the bad faith insurance cases and despite the fact that the *Pugh I* court had not sanctioned it. Appellant's theory against the union was that it had conspired with See's to bring about his bad faith discharge. On appeal respondents, as the prevailing parties, do not challenge the tort theory on which appellant relied.

Appellant does not specify any particular evidence offered in support of either theory, and we can discern no differences. We therefore consider appellant's assignments of evidentiary error without distinguishing between his causes of action. He claims that evidence tending to denigrate his character was improperly admitted where such facts were unknown to the person who discharged him at the time of discharge and that evidence of the illegality of the union contract because of sex discrimination was improperly excluded.

Evidence presented by appellant at the second trial was substantially the same as that presented at the first and is set out in detail in *Pugh I, supra,* 116 Cal.App.3d at pages 315 to 319. Because sufficiency of the evidence is not in issue, we only outline it, viewing it in a light most favorable to the judgment.

---

[5] Justice Kaufman, writing for the Fourth District of this court, in *Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155, 1163 [226 Cal.Rptr. 820], noted the confusion in analysis and terminology relating to the three theories that have emerged to support a cause of action for a "wrongfully discharged" employee against his or her employer. His suggested nomenclature to distinguish the actions is: " 'breach of employment contract' " for the true breach of contract cases under *Pugh I*; " 'tortious discharge' " for the public policy cases under *Tameny* ; and " 'bad faith discharge' " for the cases involving a tort or contract action for breach of the implied covenant of good faith and fair dealing under *Cleary*.

[6] The advantage to appellant of proving an action in tort for bad faith discharge is obvious. His damages would not be confined to those naturally arising from the contract breach or which might have been reasonably contemplated by both parties as the probable result of the breach. (See Civ. Code, § 3300; *White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 901 [221 Cal.Rptr. 509, 710 P.2d 309] (conc. and dis. opn. of Kaus, J.); *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 886-889 [208 Cal.Rptr. 394].) A plaintiff suing in tort can recover all damages proximately caused by the tortious conduct, including those for mental distress. (See Civ. Code, § 3333.) More importantly, the plaintiff has the possibility of recovering punitive damages. (Civ. Code, § 3294.) (See generally, 2 Witkin, Summary of Cal. Law, Agency and Employment, *supra,* at §§ 178-182, pp. 174-177.)

Appellant began working for See's, washing pots and pans at its Northern California plant, in 1941 and was promoted to candy maker before his entry into military service in 1942. After his discharge from the service in 1946, he returned to the employ of See's, and a year later was promoted to production manager, overseeing a small number of employees. In 1950 and again in 1957, he undertook major responsibilities in moving to new plants with growing numbers of employees. In 1971, he was promoted to vice president in charge of production of the Northern California subsidiary corporation and placed on its board of directors.

During his 32 years at See's, appellant regularly received raises, bonuses, and commendations; he received no notice of any problems, no written or formal criticisms, and no warning that disciplinary action was contemplated.

On June 25, 1973, he was directed to fly to the Los Angeles office of See's to meet with Charles Huggins, president of See's parent and subsidiary corporations. Huggins told him that he was discharged and directed him to remove his personal effects from his office the same day and not to visit with production department employees on the job. When appellant asked the reason, Huggins told him to " 'look deep within' " himself and that " 'things that you have said to people in the trade have come back to us.' " Appellant's termination was announced in a trade letter with no statement of reasons.

See's counsel conceded in summation that See's had a long-standing, unwritten policy that employees would not be discharged unless their work performance was unsatisfactory, that is, without good cause. We are cited to no evidence in the record, and we can find none, that See's denied the existence of an implied contract to discharge appellant only for good cause. Instead, See's focused its evidence on the issues of whether it acted in good faith and had good cause for the discharge.

Charles Huggins, president and chief executive officer of See's, testified that he started with the company in 1951 as an administrative assistant and worked his way up through the ranks. He became general manager and president of See's in 1969 and of See's Candy Shops, Inc., in 1972, after the retirement of Edward Peck. Peck had been a senior executive for over 31 years before he retired in 1972. Huggins discharged appellant because of his good faith dissatisfaction with appellant's performance as a member of the management team. Huggins's complaints about appellant spanned almost 20 years and included insubordination, in that appellant failed to train assistants as directed or to cooperate with other members of the administrative staff. Directives to appellant to stop employees from giving him gifts

(because of an element of coercion) went unheeded. Huggins had recommended appellant's termination in 1953 and in 1968, but Laurence See had refused to take action. Charles "Harry" See, a former owner, was unavailable as a witness and testified by deposition that appellant was designated vice president in an effort to obtain his cooperation when he was passed over for promotion. The new title did not change his responsibilities, duties, or compensation, and it was given against the advice of Huggins and Edward Peck, the former president.

Huggins testified that Charles See took control of the company in 1969 after the death of his older brother, Laurence, and began restructuring the administrative staffs in both Los Angeles and San Francisco to meet the increased competition from both foreign and domestic candy makers and to ready the company for sale. This resulted in terminations, resignations, retirements, and new hirings. Huggins asked appellant for his cooperation during this transition. The policy of restructuring continued when the new owners took over in 1972 and made Huggins president of See's Candy Shops, Inc. They told him to think like an owner, reward excellence rather than seniority, and make the company grow.

Huggins made it clear at meetings which appellant attended that unsatisfactory performance would result in termination. Early in 1973, at a staff meeting, Huggins told appellant that he had failed to do things requested of him, such as training assistants, and was not performing his duties properly. Others who were present testified that the message was "loud and clear." (Appellant admitted on cross-examination that he knew of various terminations for nonperformance; he also acknowledged that no one told him he would receive a warning before being discharged and that he knew unsatisfactory performance was a ground for discharge.)

In May 1973, appellant went with Huggins and others on a trip to Europe to view operations of European candy makers; Huggins hoped that this would induce appellant to start cooperating. Appellant was rude, argumentative, belligerent, and uncooperative on the trip, and his poor attitude reinforced Huggins's inclination to discharge him. After his return, Huggins thought quite a bit about his decision and then met with other administrative staff members and discussed with them his thoughts about discharging appellant; there was no opposition. He discussed with staff the best way to discharge appellant. They agreed on the method used to avoid the negative way appellant had handled criticism and confrontations in the past and to protect the company's secret formulas. Huggins reported to the new owners in July 1973 that appellant's discharge resulted from a combination of incompatibility and outright insubordination.

See's expert, involved in the evaluation of employee work performance as a teacher, author, and business executive, testified that employees have three kinds of skills: technical (i.e., the doing of specific things); human (i.e., how you get along with people); and conceptual (i.e., seeing the whole picture). Human and conceptual skills become more important as an employee moves higher in the management structure, and those skills are more difficult to evaluate than technical skills. The chief executive officer (CEO) has the job of evaluating top-level managers to ensure that they work together effectively as a team. How a CEO evaluates staff depends on his or her style, and the top managers must fit and be sensitive to the style of the CEO. Appellant's position placed him in that top-level group.

Testimony was elicited from See's employees, former employees, and business associates to the effect that appellant was disrespectful to his superiors and subordinates, disloyal to the company, and uncooperative with other administrative staff. The problems diminished in appellant's absence. The witnesses recounted specific episodes of conflict with appellant during his years with the company.

*Character Evidence.* ■ Appellant contends that the court erred in admitting evidence of specific incidences of his conflict with other employees, because Huggins was unaware of them at the time he discharged appellant, and therefore they were not only irrelevant, but their cumulative impact was to smear appellant's character. He also claims "that collateral evidence degrading character is not admissible . . ." under Evidence Code section 787.

His arguments are not cognizable on appeal. Although appellant's counsel vigorously cross-examined each witness on whether appellant's misconduct was reported to Huggins before appellant's discharge, no objection was made to the admission of the evidence.[7] Appellant's failure to object or otherwise protect the record in the trial court waived the issue on appeal.

---

[7] Appellant objected to See's questioning him about an incident where he allegedly displayed a rifle carried in his trunk to a subordinate and related to the employee that he had threatened some young people with the gun at a country club. When See's counsel went on to ask if appellant used this example to give the "impression of intimidation or fear" to the younger fellow employee, appellant's counsel objected on the grounds that the line of questioning had no relevance and was character assassination. See's counsel explained that the line of questioning was to show that people working under appellant were in fear of and intimidated by him, and the court overruled the objection. Appellant's contention that the court erred in admitting the evidence over his objection is not well taken. He relies on Evidence Code section 787, which provides that evidence of specific instances of conduct relevant only as tending to prove a character trait is inadmissible to attack or support the credibility of a witness. At trial, however, appellant failed to urge this objection to the admission of the evidence.

(Evid. Code, § 353; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 307, pp. 317-318.)

Moreover, appellant's character or personality in the workplace was in issue under the substantive law and the pleadings in the case. (See Evid. Code, § 1100; 1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 329, pp. 301-302.) Appellant held a managerial position, and his ability to work well with the president of the company and with other administrative staff was crucial to its success. ■ Specific acts of misconduct are admissible to show that an employee is unfit or incompetent for the job. (See *Gier* v. *Los Angeles C. E. Ry. Co.* (1895) 108 Cal. 129, 134 [41 P. 22].)

Appellant asserted that he was an excellent employee, never criticized, never argumentative, and always cooperative; these assertions were challenged by See's. Evidence of specific acts or conflicts demonstrating his personality or character and their impact on other employees was relevant. The specific incidences revealed the reasons for the negative attitude of other employee witnesses toward appellant, and Huggins was aware of their negative attitude. The evidence also explained their unanimous affirmance when Huggins proposed appellant's termination. Furthermore, Huggins testified to numerous problems with appellant based on his personal experience and his awareness of discord between appellant and other administrative staff members.

*Exclusion of Evidence of Illegality of Union Contract.* As in the first trial, appellant maintains that the reason for his discharge was pretextual, and he presented substantially the same evidence on the issue. (*Pugh I, supra,* 116 Cal.App.3d at pp. 318-319, 322-323.) The real reason, he claims, was his refusal to participate in negotiations for the 1973 union contract because he thought that paying lower wages to seasonal workers, who were mostly women, violated declared public policy against discrimination based on sex. (On retrial, appellant abandoned his theories that the contract violated antitrust law and that he was engaged as a director in the process of inquiry about the union contract. (See *Pugh I, supra,* 116 Cal.App.3d at pp. 323-324.)

The trial court ruled *in limine* that appellant could show the circumstances surrounding the union contract negotiations in 1968 and 1973, but that unless he had prior permission of the court, he could not offer evidence to the jury that the contract was illegal or that it discriminated against women. The court's ruling was seemingly[8] based on the "law of the case,"

---

[8] Appellant asserts that the court's ruling was apparently based on his failure to exhaust administrative remedies. (See *Pugh I, supra,* 116 Cal.App.3d at pp. 323-324, fn. 13.) Respondents' *in limine* motion to exclude evidence of the illegality of the union contract was based

that is, on the *Pugh I* court's holding that appellant's evidence was insufficient to support an action for retaliatory discharge under *Tameny, supra,* 27 Cal.3d 167, because appellant had failed to establish that his objections had been communicated to See's. (*Pugh I, supra,* 116 Cal.App.3d at p. 323; see 9 Witkin, Cal. Procedure, Appeal, *supra,* § 748, pp. 716-717.) Appellant, however, reasons that the evidence of illegality was equally relevant under his breach-of-contract and bad-faith-discharge theories to show a pretextual reason for his discharge. He contends that exclusion of the evidence was prejudicial error.[9]

▆ We agree with appellant that evidence showing he was fired because he objected to a union contract on the ground of illegality would be relevant in establishing the employer's lack of good cause for the discharge and thus would be admissible in his tort and contract actions. This is so, even though *Pugh I* held that appellant's evidence on this point was insufficient to establish a prima facie case of retaliatory discharge under *Tameny.* ▆ The doctrine of the law of the case does not preclude the use on retrial of evidence held insufficient to support a cause of action if that same evidence is relevant to establish a different cause of action which can be urged on retrial. ▆ But here, as in the first trial, the evidence was irrelevant and inadmissible absent a showing of the preliminary fact that appellant had communicated his objection to See's. (Evid. Code, § 403.) The court invited him to make such a showing, which he failed to do. Under these circumstances, his failure to make an offer of proof precludes consideration of any assignment of error on appeal. (See 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 2041, p. 2000.)

We conclude that appellant has waived any error in these evidentiary rulings.

### III. *Instructions*[10]

Appellant levels a broadside attack on the court's "erroneously confused and diluted" instructions and claims that the errors mandate reversal of the general defense verdict. He does not differentiate between instructions on

on two grounds, the law of the case and failure to exhaust administrative remedies. As we read the record, the court ruled on the basis of the law of the case. Appellant's failure to make an offer of proof, however, renders the basis of the court's ruling irrelevant.

[9] Appellant's argument that he should have been able to contradict the testimony of See's counsel that the contract was legal is misleading. See's counsel only testified that supplemental contracts and different wage rates for different classes of workers, such as seasonal workers, are not illegal. The witness did not testify that a contract discriminating against women would be legal.

[10] The BAJI Committee has drafted instructions, which are included in the 1987 pocket parts, for "wrongful termination" actions. See instructions Nos. 10.00 through 10.54 (1987 new). See also Wrongful Employment Termination Practice (Cont.Ed.Bar 1987) appendix L, Jury Instructions, pages 657-740.

his contract theory that See's breached an implied-in-fact agreement to discharge him only for good cause and those on his tort theory that See's violated the covenant of good faith and fair dealing which is law-imposed in every contract. Nor does he present us with an adequate record from which we can properly assess the merits of all of his claims. (See Cal. Rules of Court, rule 5; *Lynch* v. *Birdwell* (1955) 44 Cal.2d 839, 846 [285 P.2d 919].) The reporter's transcript sets out the various propositions of law which make up the charge to the jury. The clerk's transcript, however, does not reflect what instructions the parties requested or which were modified or refused, except for appellant's refused instructions Nos. 9, 17, and 18, which appear in the documents supporting his motion for a new trial.[11] Although an appellant is deemed to have excepted to the instructions he has not requested or agreed to (Code Civ. Proc., § 647), a presumption of invited error may result from failure to provide the reviewing court with an adequate record.

We remind appellant that " '[i]n a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his [or her] theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citations.]" (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 950-951 [160 Cal.Rptr. 141, 603 P.2d 58].) "Neither a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate [that which he or she has left unspoken]." (*Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 701-702 [200 Cal.Rptr. 870, 677 P.2d 1147].)

Appellant's polemics, we think, can be reduced to two claims of instructional error. His primary claim appears to be that the court's definition of "bad faith" was an erroneous statement of law and misled the jury by imposing on appellant an unduly heavy burden of proof on both his theories. Second, he claims that the court erred in refusing to give his proposed instruction No. 9: ". . . that even if [See's] was, in good faith, dissatisfied with [appellant's] performance, that, in and of itself, is not sufficient to constitute good cause for termination." In a related argument, he contends that the role of the jury was unduly restricted, as it was not allowed to determine objectively the legitimacy or the "fairness" of See's decision to discharge him.

---

[11] Appellant's motion for new trial was based on irregularity in the proceedings (Code Civ. Proc., § 657, subd. 1) and on errors in law (Code Civ. Proc., § 657, subd. 7). As a basis for the first ground, he alleged misconduct of See's counsel in impugning the character of appellant by asking questions about the gun incident that had no evidentiary support. Although the admission of character evidence is challenged in this appeal, misconduct of counsel is not. As errors in law, he pointed to the admission and exclusion of evidence and the refusal to give his instructions Nos. 9, 17, and 18. On appeal appellant has not raised the issue of the court's refusal to give instructions Nos. 17 and 18. Significantly, he did not challenge the instruction defining bad faith in his motion for new trial.

Because appellant's arguments do not distinguish between his two causes of action, we set out the pertinent instructions in some detail. It is apparent that the court, in charging the jury, separated the legal propositions which applied to the contract action from those which applied to the tort action.

*General Instructions.* The court instructed the jury that appellant was seeking damages under three separate legal theories.[12] "One of [appellant's] theories is that See's . . . breached an implied contract not to terminate him without good cause. Under this theory, [appellant] has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: [¶] (1) The existence of an implied contract of employment that allowed [appellant] to be terminated only for good cause; [¶] (2) A breach of that contract by . . . See's, and [¶] (3) Damages legally caused by that breach.

"[Appellant's] second theory is that See's breached the covenant of good faith and fair dealing implied by law in any employment contract. Under this theory, [appellant] has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: [¶] (1) The existence of an implied contract of employment; [¶] (2) That the circumstances of [appellant's] termination by . . . See's revealed bad faith and were contrary to the duty of good faith and fair dealing; and [¶] (3) Damages legally caused by that bad faith termination. [¶] [Under] this theory, [appellant] seeks additional damages known as punitive damages. . . .

"[Appellant's] third theory is that the . . . Union conspired with . . . See's to bring about a bad faith termination of [appellant]. . . ."

The court explained that appellant was not required to prevail on all his theories, but had to prove by a preponderance of the evidence all the facts for at least one theory of recovery.[13] The court instructed on the meaning of "preponderance of the evidence" (adapted from BAJI No. 2.60) and directed the jury to consider all the evidence bearing on each issue, regardless of who produced it. It further instructed that "[t]he [appellant] may attack the reasons given by . . . See's for terminating [appellant] only by showing

---

[12] In its responding brief, See's asserts that appellant proposed the instructions outlining his three theories for recovery, and appellant does not dispute this statement.

[13] Ordinarily, a plaintiff asserting both a contract and tort theory arising from the same factual setting cannot recover damages under both theories, and the jury should be so instructed. (See *Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328, 337 [5 Cal.Rptr. 686, 353 P.2d 294].) Here, the court did not specifically instruct that damages could be awarded on only one theory, but did direct that punitive damages could be awarded only if the jury first determined that appellant had proved his tort action.

Whether appellant is seeking redress for violation of one "primary right" on two different theories or for violation of two independent primary rights is a troublesome question which we need not address. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 23, 25, pp. 66-67, 69.)

either that the reasons given were not sufficient reasons under the employment contract, or that the reasons given by . . . See's for terminating [appellant] were a pretext and that the real reason was one prohibited by the contract." The court stated that it was established that Charles Huggins, the president of See's, was its agent.

The court defined express and implied contracts and explained, "[o]rdinarily an employment may be terminated at will without any reason or cause. An exception exists if there is an implied agreement that the employment will continue pending the occurrence of some event such as the unsatisfactory performance of the employee's service, or the existence of some other cause for termination."

After giving the above general instructions, the court instructed on each cause of action separately, as follows.

*Instruction on Breach of Contract.* "Now, a contract of employment is terminable only for a good cause if either of two conditions exist: [¶] (1) The contract was supported by consideration independent of the services to be performed by the employee . . . ; or, [¶] (2) The parties agreed, expressly or impliedly, that the employee could be terminated only for good cause. [¶] . . . [C]onsideration independent of the services to be rendered . . . can be found in an employee's satisfactory lengthy past . . . service alone . . . [i]f you find that in so providing satisfactory long-term employment to a single employer, [appellant] substantially diminished his economic mobility." It then enumerated the factors set out in *Pugh I* that could be considered in finding the existence of an implied contract to terminate only for good cause. The court instructed that "[a] just cause or good cause for termination of an employment means a fair and honest cause or reason regulated by the good faith of the employer. [¶] In deciding this issue, care must be exercised, however, so as to not interfere with the legitimate exercise of managerial discretion by the employer. And where, as here, the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of its subjective judgment."

*Instruction on Bad Faith Discharge.* The court next instructed on appellant's second theory: "Now, there is an implied covenant of good faith and fair dealing in every contract, including employment contracts, to the effect that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. [¶] The question of what is or is not good faith and fair dealing between an employer and an employee, or what constitutes good cause for termination is for you to decide under all the circumstances of this case, and in light of the evidence that has been presented.

"You are not to decide whether or not in your opinion the [appellant's] work performance was or was not satisfactory. [¶] It is not appropriate for you to substitute your opinion for that of the company management in evaluating [appellant's] work performance. [¶] You shall examine the reasons given by the employer as to why the [appellant] was terminated for unsatisfactory work performance, and to determine whether or not the employer acted in good faith and not arbitrarily.

"The phrase 'good faith' of the employer describes the state of mind of the employer which is honest of purpose, free from an intention to defraud, and in keeping with one's duty or responsibility. [¶] The phrase 'bad faith' is the opposite of 'good faith' and describes a state of mind of the employer which is fraudulent or designed to mislead or deceive, or one in which the neglect or refusal to fulfill some duty or contractual obligation is not the result of an honest mistake, but arises out of a sinister or evil motive. . . ."

*Instruction on Damages.* The court then instructed on the measure of contract damages if the jury found that See's breached its implied contract. It separately instructed on the measure of tort damages, including punitive damages, if the jury found that See's breached the covenant of good faith and fair dealing or if the union conspired in the wrongdoing.[14]

*Definition of Bad Faith.* ▆▆▆ Appellant claims that the instruction defining bad faith had the effect of improperly "saddl[ing] appellant with the burden of proving [See's] 'fraudulent,' 'evil' or 'sinister' motive" for the discharge, thereby forcing him to prove the type of conduct required only for punitive damages in both his contract and tort actions.[15]

---

[14] The court's pertinent instructions on damages are as follows: "Now, if you find that [appellant] has proven his case on the theory that See's breached an implied contract of employment, then you are to decide the nature and extent of [appellant's] damages. [¶] For the breach of an obligation arising from contract, the measure of damage is the amount which will reasonably compensate the [appellant] for all of the economic loss legally caused thereby, or which in the ordinary course of things will be likely to result therefrom. [¶] He may recover *the total amount of wages and benefits which would have been received under the terms of* the employment contract, less any sum which he has earned or could have earned in other employment by reasonable effort.

"If under the Court's instructions you find that the [appellant] has proven that he is entitled to recovery because [See's] has breached its covenant of good faith and fair dealing, then you must award the [appellant] damages in an amount that will reasonably compensate him for all loss or harm, provided that you find that it was or will be suffered by him and legally caused by [See's] conduct. [¶] The amount of such award shall include reasonable compensation for any pain, discomfort, fears, anxiety and other emotional distress suffered by the [appellant], and for similar suffering reasonably certain to be experienced in the future from the same cause. . . . [¶] If you find that [appellant] suffered damage as a legal result of the conduct of . . . See's, in breach of the implied covenant of good faith and fair dealing, you may then consider whether you should award punitive or exemplary damages against . . . See's only, for the sake of example and by way of punishment. . . ."

[15] In a confusing argument, appellant distinguishes the burden of proving "affirmative bad faith" based on malicious conduct which justifies punitive damages from the burden of prov-

Appellant requested, and the court gave, instructions on his contract and tort theories. (See fn. 12, *ante.*) As stated above, under his tort theory for breach of the covenant of good faith and fair dealing, he had the burden of proving (1) the existence of an implied contract of employment; (2) that the circumstances of appellant's termination by See's revealed *bad faith* and were contrary to the duty of good faith and fair dealing; and (3) damages legally caused by that *bad faith* termination. Thus, existence of See's "bad faith" was a factual issue for the jury in appellant's tort action. (See *Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 792 [121 Cal.Rptr. 200]; cf. *Orange County Cable Communications Co.* v. *City of San Clemente* (1976) 59 Cal.App.3d 165, 172 [130 Cal.Rptr. 429].) It was therefore incumbent on the court to give a specific instruction on the meaning of bad faith, if requested.

How to define bad faith in the context of employment contracts remains an unsettled area of the law. From our review of "wrongful discharge" cases we can discern no generally accepted "correct" definition of bad faith.[16] Our task, however, does not encompass working out a comprehensive definition of bad faith in the employment relation. It requires only that we determine whether the definition given was an erroneous statement of the law and thus misled the jury about appellant's burden of proof.

The court's instruction on bad faith provided the jury with alternate definitions: it describes a state of mind of the employer "which is fraudulent *or* designed to mislead or deceive, *or* one in which the neglect or refusal to fulfill some duty or contractual obligation is not the result of an honest mistake, but arises out of a sinister or evil motive." (Italics added.) Under this definition, the jury was not required to equate bad faith only with sinister or evil motive.

Moreover, the court's definitions of good faith and bad faith conformed to generally accepted meanings of the phrases and gave the jury some standards, albeit not the only ones, by which to assess the employer's state of mind. ■ Black's Law Dictionary defines "[g]ood faith" as ". . . an intangible and abstract quality with no technical meaning . . . encom-

---

ing a violation of the duty not to deprive the other party of the benefits of the contract. The latter type of bad faith, he claims, can be based on negligence. He cites no authority to support his distinction in types of bad faith. We do not agree that bad faith can be based on negligence in the context of an employment contract.

[16] Most of the cases that have reached the appellate court for review have been at the pleading stage, and, therefore, there has been little focus on instructions to the jury. Several cases have described conduct or circumstances which equate with tortious breach of the good faith covenant, but not specifically the employer's mental state. (See, e.g., *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d at p. 1171 [summary adjudication]; *Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 262 [215 Cal.Rptr. 860] [trial—instructions relating to the burden of proof, but not the definition of bad faith, were discussed]; *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109, 1118-1119 [207 Cal.Rptr. 123] [demurrer].)

pass[ing], among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage . . . . Honesty of intention . . . ." (Black's Law Dict. (5th ed. 1979) p. 623.) Webster's definition is similar: "a state of mind indicating honesty and lawfulness of purpose: belief in one's legal title or right: belief that one's conduct is not unconscionable . . . : absence of fraud, deceit, collusion, or gross negligence . . . ." (Webster's New Internat. Dict. (3d ed. 1970) p. 978.)

■ "Bad faith" is defined as "[t]he opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake . . . , but by some interested or sinister motive[,] . . . not simply bad judgment or negligence, but rather . . . the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will. [Citation.]" (Black's Law Dict., *supra,* at p. 127; see also *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 876 [110 Cal.Rptr. 511]; *Palmer* v. *Financial Indem. Co.* (1963) 215 Cal.App.2d 419, 429 [30 Cal.Rptr. 204]; *Hodges* v. *Standard Accident Ins. Co.* (1961) 198 Cal.App.2d 564, 574 [18 Cal.Rptr. 17]; *Davy* v. *Public National Ins. Co.* (1960) 181 Cal.App.2d 387, 396 [5 Cal.Rptr. 488]; but cf. *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173].)

■ The court directed in the tort action that punitive damages could only be awarded if the jury first determined that See's in bad faith injured the right of appellant to receive the benefits of the contract. If the jury so determined, it could then consider whether See's acted with malice, fraud, and oppression. Twice the court instructed the jury on the meaning of malice, fraud, and oppression as a basis for punitive damages: once in the charge to the jury and again in explaining the verdict forms. The jury was clearly required to find a greater culpability on the part of the employer—an intent to vex, injure, or annoy, or to act with a conscious disregard of appellant's rights—before considering an award of punitive damages in the tort action. (Cf. *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103].)

We find that the court's specific instruction on the definition of bad faith was not an erroneous statement of the law. The more culpable mental state required for punitive damages was sufficiently distinguished from bad faith so that it is not probable that the jury was misled about appellant's burden of proof in his tort action. If appellant disagreed with the definition of bad faith and wanted the jury instructed in a different manner, it was incumbent upon him to submit instructions which were acceptable to him, and to bring

up a proper record on appeal. (See *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

Appellant also speculates that the jury misapplied the instructions on bad faith to his contract action and thereby erroneously required him to prove conduct required for punitive damages, that is, " 'evil,' 'sinister,' or 'fraudulent' " conduct on the part of See's, even in that action.

The focus in the contract action was whether See's had good cause to terminate appellant. It is true that the court said good cause under this theory means "a fair and honest cause or reason regulated by the good faith of [See's]." Good faith was referred to as regulating good cause but was not further underscored. Nor was the term "bad faith" used. Looking at the instructions as a whole, we do not think it probable that the jury was misled on appellant's burden of proof in the contract action, in view of the court's specific instructions in the tort action.

Furthermore, the jury was presented with two theories for recovery against See's[17] and was correctly instructed that to prevail appellant had to establish, by a preponderance of the evidence, the elements necessary for only one theory. The jury was instructed on the issues to be proved under each theory and the damages which could be awarded under each theory. We can properly assume that the jury understood the difference between these two theories and correctly applied the instructions. (*Solgaard* v. *Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 371 [99 Cal.Rptr. 29, 491 P.2d 821]; *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 369 [317 P.2d 601]; *Douglas* v. *Southern Pacific Co.* (1928) 203 Cal. 390, 396 [264 P. 237].)

*Instruction No. 9 and the Role of the Jury.* ■ Appellant contends here, as he did in his motion for new trial, that the court committed prejudicial error in refusing to give his instruction No. 9: "You are instructed that even if [See's] was, in good faith, dissatisfied with [appellant's] performance, that, in and of itself, is not sufficient to constitute good cause for termination." Appellant claims that in the absence of this instruction, the employer could prevail by showing only good faith dissatisfaction with appellant's work performance without having to show good cause for his discharge. This, he argues, reduces his contract to a "satisfaction contract" rather than an implied contract that he can be terminated only for good cause—a "cause contract." His failure to discuss this instruction in the context of the instructions given has made it difficult to sort out his arguments about the difference between a "satisfaction contract" and dissatisfaction with work performance as good cause to discharge.

---

[17] Appellant also argued a tort theory against See's based on a conspiracy with the union to breach the covenant of good faith.

■ A "satisfaction contract" is one involving matters of fancy, taste, or judgment. In such a contract the promisor is the sole judge of his or her satisfaction. Thus, if the promisor asserts in good faith that he or she is not satisfied, there can be no inquiry into the reasonableness of that attitude. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 730, pp. 660-661.) An employment contract where the employee's term of employment will continue as long as the employer is satisfied with the employee's services comes within this class of contracts. (*Id.,* at § 731, p. 661.) Where, however, the evidence shows no bona fide dissatisfaction and the discharge is for other reasons, the employee can recover. (*Ibid.; Coats v. General Motors Corp.* (1934) 3 Cal.App.2d 340, 348 [39 P.2d 838].) Thus, in an action for breach of a "satisfaction contract," the jury's role is limited to deciding whether the employer's dissatisfaction is bona fide. The employer's reason for the discharge is only evidence going to that issue, and the jury need not decide whether the discharge, in fact, was for good cause. ■ In the case before us, See's does not contend that appellant had a "satisfaction contract." It concedes that appellant had a "cause contract," but argues that its dissatisfaction with appellant's work performance for the reasons stated was good cause.

As support for instruction No. 9, appellant cites *Rabago-Alvarez v. Dart Industries, Inc.* (1976) 55 Cal.App.3d 91 [127 Cal.Rptr. 222] and *Toussaint v. Blue Cross* (1980) 408 Mich. 579 [292 N.W.2d 880], which were wrongful discharge actions based on breach of contract. His reliance is misplaced.

In *Rabago-Alvarez,* the trial court found that the employee had an express contract, supported by independent consideration, that she would be terminated only for good cause. The reviewing court rejected the employer's argument that it was entitled to discharge the employee if it was in good faith dissatisfied with her performance, saying "[e]ven if this were the case, the trial court found" that the employer was not in good faith dissatisfied. (*Rabago-Alvarez v. Dart Industries, Inc., supra,* 55 Cal.App.3d at p. 97.) This dictum is not support for appellant's instruction No. 9.

In *Toussaint,* the employee, hired for an indefinite term, filed an action for breach of contract, claiming he had an express contract that he would be discharged only for good cause; he based the contract on oral assurances of continued employment and the employer's written personnel policies. Because no tort action for breach of the covenant of good faith was alleged, that theory was not considered by the reviewing court. In affirming the judgment for contract damages for the employee, the Michigan court concluded that an employer's policy manual could be interpreted as an agreement to terminate only for good cause and could give rise to rights enforceable by the employee in contract. (*Toussaint v. Blue Cross, supra,* 408 Mich.

at pp. 614-615 [292 N.W.2d at p. 892].) The evidence was sufficient to support the jury's finding that such a contract was formed. (*Id.,* at p. 613 [292 N.W.2d at p. 891].)

The *Toussaint* court went on to consider the role of the jury in deciding whether the employer had breached the contract. It rejected the argument that the employer was the sole judge of its dissatisfaction and stated that "where an employer has agreed to discharge an employee for cause only, its declaration that the employee was discharged for unsatisfactory work is subject to judicial review. The jury as trier of facts decides whether the employee was, in fact, discharged for unsatisfactory work. A promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge. There must be some review of the employer's decision if the cause contract is to be distinguished from the satisfaction contract." (*Toussaint* v. *Blue Cross, supra,* 408 Mich. at p. 621, fn. omitted [292 N.W.2d at p. 895].)

The *Toussaint* court, noting that the role of the jury will differ in each case, discussed levels of difficulty in presenting to the trier of fact the issue of good cause to discharge. "Where the employer claims that the employee was discharged for specific misconduct—intoxication, dishonesty, insubordination—and the employee claims that he [or she] did not commit the misconduct alleged, the question is one of fact for the jury: did the employee do what the employer said he [or she] did?" (*Toussaint* v. *Blue Cross, supra,* 408 Mich. at p. 621, fn. omitted [292 N.W.2d at p. 896].) And, "[w]here the employer alleges that the employee was discharged for one reason—excessive tardiness—and the employee presents evidence that he [or she] was really discharged for another reason—because he [or she] was making too much money in commissions—the question also is one of fact for the jury. The jury is always permitted to determine the employer's true reason for discharging the employee." (*Id.,* at p. 622, fn. omitted [292 N.W.2d at p. 896].)

As the *Toussaint* court acknowledged, however, the role of the jury is more difficult to resolve where the employee is discharged for stated reasons, but the employee contends that those reasons do not amount to good cause. "If the jury is permitted to decide whether there was good cause for discharge, there is the danger that it will substitute its judgment for the employer's. If the jurors would not have fired the employee for doing what he [or she] admittedly did, or they find he [or she] did, the employer may be held liable in damages although the employee was discharged in good faith and the employer's decision was not unreasonable." (*Toussaint* v. *Blue Cross, supra,* 408 Mich. at p. 622 [292 N.W.2d at p. 896].)

The *Toussaint* court reasoned: "[w]hile the promise to terminate employment only for cause includes the right to have the employer's decision reviewed, it does not include a right to be discharged only with the concurrence of the communal judgment of the jury." (*Toussaint* v. *Blue Cross, supra,* 408 Mich. at p. 622 [292 N.W.2d at p. 896].) It nevertheless concluded that "the jury should, where such a promise [to discharge only for good cause] was made, decide whether the reason for discharge amounts to good cause: is it the kind of thing that justifies terminating the employment relationship? Does it demonstrate that the employee was no longer doing the job?" (*Id.,* at p. 623, fn. omitted [292 N.W.2d at p. 896].) The court cautioned that employers who do enter into such a contract "must be permitted to establish their own standards for job performance and to dismiss for non-adherence to those standards although another employer or the jury might have established lower standards." (*Ibid.* [292 N.W.2d at p. 897].)

Where the employee challenges the good cause, the *Toussaint* court rejected an instruction that would allow the jury to find no breach if it decided the employer's decision was not unreasonable. It did so because such an instruction would be practically the same as that for a "satisfaction contract." (*Toussaint* v. *Blue Cross, supra,* 408 Mich. at pp. 622-623 [292 N.W.2d at p. 896].)

We think that the reasoning of the *Toussaint* court supports the instructions given on the contract action in the case before us and is consistent with the guidance offered by the *Pugh I* court for retrial. (*Pugh I, supra,* 116 Cal.App.3d at pp. 329-330.) It offers no support for instructions in appellant's tort action for breach of the good faith covenant, because the *Toussaint* court did not address the issue.

The thrust of appellant's arguments relating to his instruction No. 9, without distinguishing his contract and tort theories,[18] is that the jury was improperly prevented from deciding whether the employer's dissatisfaction amounted to good cause and whether the termination was fair to appellant. In other words, he is seeking a standard that allows the jury to determine objectively whether the employer has exercised legitimate business judgment and whether the discharge was fair to the employee regardless of the business reasons. Respondent See's argues for a standard, also without differentiation between the two theories, that would insulate the employer's decision from judicial review except for a determination that the discharge was made in good faith and was not arbitrary. We do not agree with either position.

---

[18] In oral argument, appellant stated that instruction No. 9 was meant to apply only to his contract action, but his briefs do not reflect any such restriction.

 We first consider appellant's contract theory. In that action the jury was instructed that "[a] just cause or good cause for termination . . . means a fair and honest cause or reason regulated by the good faith of the employer." It was cautioned to exercise care so as not to interfere with the legitimate exercise of the employer's managerial discretion and to allow substantial scope for the employer's subjective judgment because appellant occupied a sensitive managerial position. (*Pugh I, supra,* 116 Cal.App.3d at p. 330.) This instruction is directly from *Pugh I* and does not foreclose the jury from considering the business judgment of the employer or the fairness to the employee of the decision to discharge. Its effect is to charge the jury with the duty to "balance the employer's interest in operating [its] business efficiently and profitably with the interest of the employee in maintaining his [or her] employment . . . ," giving substantial weight to managerial discretion. (*Crosier* v. *United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132, 1139 [198 Cal.Rptr. 361].) Under this instruction, the employer's good faith dissatisfaction alone is not sufficient to constitute good cause to discharge the employee in breach of the contract, and instruction No. 9 is superfluous.

In any free enterprise system, an employer must have wide latitude in making independent, good faith judgments about high-ranking employees without the threat of a jury second-guessing its business judgment. Measuring the effective performance of such an employee involves the consideration of many intangible attributes such as personality, initiative, ability to function as part of the management team and to motivate subordinates, and the ability to conceptualize and effectuate management style and goals. Unlike the employee with routine or mechanical duties whose performance can be measured by an objective standard, a management employee's unsatisfactory performance is often difficult to pinpoint precisely, and the reasons for his or her discharge may be difficult to articulate. (See Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power* (1967) 67 Colum. L.Rev. 1404, 1428; Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith* (1980) 93 Harv. L.Rev. 1816, 1840.) Although the jury must assess the legitimacy of the employer's decision to discharge, it should not be thrust into a managerial role.

The employer does not, of course, have a right to make an arbitrary or unreasonable decision about terminating an employee when there is a contract to terminate only for good cause. In deciding whether the employee's termination was for "a fair and honest cause or reason regulated by the good faith of the employer," the jury does scrutinize the employer's business judgment and determines whether the discharge was justified under all the circumstances. If the reasons advanced by the employer for the discharge are trivial, capricious, unrelated to business needs or goals, or pre-

textual, the jury may properly find that the stated reason for termination was not a "fair and honest cause or reason" regulated by good faith. In this sense, the employer does not have an unfettered right to exercise discretion in the guise of business judgment. (See *Crosier* v. *United Parcel Service, Inc., supra,* 150 Cal.App.3d at p. 1140, rejecting the business judgment rule.) We think the instructions given sufficiently conveyed to the jury the need to balance the competing interests.

■ On the other hand, in the tort action, appellant's own instructions on the issues to be proved suggest the limits of the jury's inquiry. He had to prove: (1) the existence of an implied contract of employment; (2) that the circumstances of appellant's termination by See's revealed bad faith; and (3) damages caused by that bad faith termination. (See *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d at p. 1169; *Newfield* v. *Insurance Co. of the West* (1984) 156 Cal.App.3d 440, 445-446 [203 Cal.Rptr. 9]; cf. *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 779, fn. 3 [206 Cal.Rptr. 354, 686 P.2d 1158] (conc. and dis. opn. of Bird, C. J.).)

The employee has the burden of proving that the employer's action was in bad faith, that is, the employer had a wrongful motive in depriving the employee of the benefits of contract, and the employer's good or bad faith is the only issue, other than the existence of the contract and damages, to be decided by the jury. Whether the employer exercises sound business judgment or whether the employee's work performance is satisfactory are not issues to be decided by the jury, and it was so instructed. Good cause to discharge is, however, evidence of the employer's justification for its actions and inferentially of its good faith. The converse is also true. Lack of good cause is evidence that the employer acted in bad faith, i.e., had a wrongful motive in depriving the employee of the benefits of the employment contract. (Cf. *Corbin on Contracts* (1984 supp. by Kaufman, pt. 1) § 654D, pp. 800-807.) Even an honest, though mistaken, belief that the employer for legitimate business reasons had good cause for the discharge would negate bad faith. (See *Burton* v. *Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972, 979 [243 Cal.Rptr. 277]; *Rulon-Miller* v. *International Business Machines Corp.* (1984) 162 Cal.App.3d 241, 253 [208 Cal.Rptr. 524].)

We think this analysis of the jury's role in a bad faith discharge action is consistent with the statement in *Koehrer* v. *Superior Court, supra,* 181 Cal.App.3d at page 1171, that if "the existence of good cause for discharge is asserted by the employer without probable cause and in bad faith, that is, *without a good faith belief that good cause for discharge in fact exists,* the employer has tortiously attempted to deprive the employee of the benefits of the agreement . . . ." (Italics added.)

■ We conclude that the court did not err in refusing to give appellant's instruction No. 9 because we think it is misleading in his tort action,

unnecessary in his contract action, and, as presented to us, an incomplete statement of the issues to be decided in either his contract or tort action. Such an instruction may properly be refused. (See *Hardin* v. *Elvitsky* (1965) 232 Cal.App.2d 357, 372 [42 Cal.Rptr. 748].)

### The Union

The evidence supporting appellant's theory that the union had conspired with See's to bring about his bad faith discharge was essentially the same as that produced at the first trial. (See *Pugh I, supra,* 116 Cal.App.3d at p. 319.) A witness at a union negotiating meeting testified that he heard Mr. Button, who succeeded appellant as production manager, say: " 'Now we've taken care of Mr. Pugh. What are you going to do for us.' " At the second trial, Mr. Button denied making the statement, other witnesses present testified that they heard no such statement, and the witness who allegedly heard the statement (Mr. Shaw) testified that it may have been made in jest. Appellant did not sustain his burden of proof on this cause of action, and the jury so found by its general defense verdict. Appellant does not contend otherwise on appeal.

### Conclusion

The judgment for respondents is affirmed.

White, P. J., and Merrill, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 10, 1988. Mosk, J., Broussard, J., and Kaufman, J., were of the opinion that the petition should be granted.